STUART–JAMES COMPANY, INC., and Marc N. Geman, Petitioners,

v.

SECURITIES & EXCHANGE COMMISSION, Respondent.

No. 87–1402.

United States Court of Appeals, District of Columbia Circuit.

Argued April 14, 1988.
Decided Sept. 20, 1988.

the phrase according to which their actions would have been in conformity with the rule's net capital requirements. In addition, they contend that the Commission violated provisions of the Administrative Procedure Act ("APA") by failing to publish its interpretation of the rule. Because we believe that the Commission's interpretation of "unrealized profit" is a reasonable one and that it acted within its discretion in affirming the NASD order, we deny the petition for review.

## I. Background

### A. *Origin of the Case*

Petitioner Stuart–James entered into an underwriting agreement with U.S. Electronics Group ("USEG") on November 1, 1984. Stuart–James undertook a firm-commitment underwriting of $1.74 million of the $2 million securities offering. As is done in firm-commitment offerings, Stuart–James purchased the securities in advance from USEG and then undertook to resell them to individual customers. According to the underwriting agreement, Stuart–James would purchase the securities at a 10% discount from the public offering price. This 10% discount, or "concession," would constitute Stuart–James's compensation for its role in the transaction.

The NASD requires its members to submit underwriting plans to it for advance review. In September, Stuart–James had initially submitted a plan whereby it would underwrite all $2 million of the USEG offering, but the NASD rejected the plan as submitted because it found that Stuart–James would not have had enough capital to support an offering of that size. In late October, Stuart–James submitted a new plan according to which it would underwrite only $1.74 million of the offering, and the NASD approved the plan. The offering became effective on November 1.

On November 13, the NASD reviewed Stuart–James's October financial report and changed its view. It found that Stuart–James's net capital at the time it entered into the USEG agreement was not

Donald T. Trinen, with whom Christa D. Taylor was on the brief, for petitioners. Ralph V. DeMartino also entered an appearance for petitioners.

Lucinda O. McConathy, Sp. Counsel, S.E.C., with whom Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Paul Gonson, Sol., and Batya Roth, Atty., S.E.C., were on the brief, for respondent.

Before MIKVA, and D. H. GINSBURG, Circuit Judges and JACKSON,* District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

The Stuart–James Company is a securities broker-dealer. Marc N. Geman is its executive vice-president. They petition for review of an order of the Securities and Exchange Commission ("Commission" or "SEC") affirming a decision of the National Association of Securities Dealers ("NASD") censuring them and imposing a $500 fine for violating the Commission's net capital rule. Stuart–James is a member of NASD. Petitioners challenge the Commission's interpretation of the term "unrealized profit" in the net capital rule, and propose a different interpretation of

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

in fact sufficient to undertake the underwriting while conforming to the net capital rule. The NASD informed Stuart–James of its analysis and asked Geman, the executive vice-president, to submit a new net capital computation. Working with the information submitted by Stuart–James, the NASD calculated that Stuart–James had a net capital deficiency of $81,685.

The following April, the NASD District Business Conduct Committee ("DBCC") filed a complaint against Stuart–James and Geman, charging them with conducting a securities business without maintaining sufficient net capital as required by Rule 15c–3. It found that the company had violated the rule, but dismissed the complaint because it held that mitigating circumstances existed. On review, the NASD Board of Governors affirmed the DBCC's finding that Stuart–James had violated the net capital rule, but reversed the decision to dismiss the complaint. The Board imposed sanctions in the form of an official censure and a $500 fine. The SEC reviewed the Board's findings and upheld both the censure and the imposition of sanctions.

## B. The "Unrealized Profits" Dispute

The disagreement between the Commission and Stuart–James stems in large part from their differing interpretations of the net capital rule. The Securities and Exchange Act of 1934 authorizes the SEC to impose minimum financial responsibility requirements on brokers. It requires brokers to operate within

> such rules and regulations as the Commission shall prescribe as necessary or appropriate in the public interest or for the protection of investors to provide safeguards with respect to the financial responsibility and related practices of brokers and dealers.... Such rules and regulations shall (A) require the maintenance of reserves with respect to customers' deposits or credit balances, and (B) no later than September 1, 1975, establish minimum financial responsibility requirements for all brokers and dealers.

15 U.S.C. § 78o(c)(3) (1982). Pursuant to Rule 15c–3, the SEC has promulgated various regulations imposing minimum capital requirements upon brokers. The net capital rule was designed to engender investor confidence in brokers by requiring them to maintain a specific percentage of liquid assets in relation to indebtedness. 17 C.F.R. § 240.15c3–1(a) (1987). See Touche Ross & Co. v. Redington, 442 U.S. 560, 570, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1979) (net capital rule is "the principal regulatory tool by which the Commission and the Exchange monitor the financial health of brokerage firms and protect customers from the risks involved in leaving their cash and securities with broker-dealers.").

The net capital rule states that a firm's "aggregate indebtedness" may not exceed 1500% of its "net capital." 17 C.F.R. § 240.15c3–1(a). The regulations set forth a formula for calculation of net capital that works on three variables: (1) the excess net capital before an underwriting commitment is taken on; (2) the offering's gross "haircut"; and (3) the broker's "unrealized profit" on the offering. The calculation begins with any net capital that a firm has that is not already being used to offset indebtedness. From this amount is subtracted the appropriate "haircut" for a given transaction—that is, the specific percentage of the offering price that the regulations state must be deducted from net capital for that kind of securities offering. The haircut, however, is itself offset by the firm's "unrealized profit" from the transaction. 17 C.F.R. § 240.15c3–1(c)(viii). A firm is thus within the bounds of the net capital rule so long as its excess net capital and unrealized profits exceed a transaction's haircut.

The parties to the instant case disagree over only one component of the formula, but it is enough to make the difference between whether appellants operated within the requirements of the net capital rule. Both sides agree that before it entered into the underwriting agreement with USEG Stuart–James's aggregate indebtedness was $4,086,371.77. For that figure not to have exceeded 1500% of net capital—and thereby have put Stuart–James in violation of the net capital rule—it was necessary

that the firm's net capital remain above $272,424.92. It is further undisputed by the parties that the firm had on hand $538,-740.35 in net capital going into the USEG underwriting. Because $272,424.92 of that amount had to be retained to offset the firm's existing aggregate indebtedness, $266,315 in net capital was available to offset the indebtedness from the USEG underwriting. The parties also agree that the haircut set by the regulations for the USEG transaction was 30% of the market value of the offering—in this case, 30% of the $1.74 million, or $522,000. 17 C.F.R. § 240.15c3–1(c)(2)(vi)(J). The only disagreement comes over the final figure in the formula—the level of "unrealized profit"—and whether it was large enough to keep the transaction's net capital requirements below the $266,315 in excess net capital that Stuart–James had.

The parties present two alternative interpretations of the term "unrealized profit." The Commission and the NASD contend that the "unrealized profit" in this transaction is simply the 10% underwriter's concession, or $174,000, that Stuart–James would gain on the sale of the stock. Following the formula established in the regulations, they subtracted this $174,000 from the $522,000 haircut and calculated a net deduction from capital for the transaction of $348,000. Because the firm's excess net capital at this time was only $266,315, the NASD and the Commission found that the firm had a net capital deficiency of $81,685 on November 2.

Stuart–James contends that its unrealized profit was larger than the Commission stated, and that when figured properly it was sufficiently large to keep the firm within the requirements of the net capital rule. Stuart–James makes three distinct criticisms of the approach to figuring net capital used by the Commission and the NASD. First, it uses a larger figure than the NASD and the Commission did for its concession on the securities sale. It notes that as it turned out, its actual concession was $30,000 larger than anticipated because there was a $300,000 overallotment on which it received a 10% concession. It therefore calculates that its actual conces-

sion was not $174,000 but $204,000. Stuart–James uses this larger figure in its capital calculations. Second, Stuart–James notes that the underwriting agreement called upon USEG to pay it in addition to the 10% underwriter's concession an unallocated expense allotment of not less than $120,000. It maintains that this unallocated expense allotment should count toward "unrealized profit" as well, since it could keep the allowance whether it spent it or not, and its actual underwriting expenses were only $19,000. Finally, the firm notes that the unallocated expense allotment, which was set at not less than $120,000, ended up actually being $138,000 in the final accounting between Stuart–James and USEG and that is the figure Stuart–James uses in its calculations.

Using these three modifications, Stuart–James calculated net profit in such a manner that it remained within the strictures of the net capital rule. It began, as did the NASD and the Commission, with a haircut of $522,000. It then subtracted an "unrealized profit" of $342,000—the $174,000 concession recognized by the Commission supplemented by the additional $30,000 traceable to the overallotment and the $138,000 unallocated expense allotment. Subtracted from the $522,000 haircut, the net profit deduction required for the transaction by this calculation is $180,000. Because it is agreed that Stuart–James had on hand $266,315 at the time of the transaction, Stuart–James contends that it never experienced a net capital deficiency.

Stuart–James's first modification, the additional $30,000 it added to the concession due to the overallotment, is not a large enough amount to affect whether or not the company violated the net capital rule. Nor does its third change, figuring the unallocated expense allotment at $138,000 rather than $120,000 make a significant difference. In neither case is the amount of money at issue large enough to affect whether or not Stuart–James had sufficient capital to be in conformity with the rule. The only material issue presented by the case is the propriety of Stuart–James's second modification, *i.e.* whether it may count

the unallocated expense allotment as part of its unrealized profit at all. The Commission, in affirming the NADC's decision, held that it could not. We consider this question on this petition for review.

## II. Discussion

The net capital rule states that "No broker or dealer shall permit his aggregate indebtedness to all other persons to exceed 1500 percent of his net capital." 17 C.F.R. § 240.15c3–1(a) (1987). If we accept the Commission's interpretation of the phrase "net capital," it is clear that the petitioners were in violation of the rule. Although the Commission's actions in this case were not ideal, we hold that petitioners were bound by the Commission's interpretation of the phrase.

We note at the outset that considerable deference is owed to an administrative agency's interpretation of regulations that it has promulgated under a statute that Congress has charged it with enforcing. The Supreme Court has instructed that "[i]n construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes the controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (*quoting Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Agency interpretations are to be given particular deference when they "rest upon matters peculiarly within the administrator's field of expertise." *Southern Mutual Help Ass'n v. Califano,* 574 F.2d 518, 526 (D.C.Cir.1977) (*quoting Thompson v. Clifford,* 408 F.2d 154, 167 (D.C.Cir.1968)).

Evaluated under this most deferential standard, we are unable to say that the Commission's interpretation of the phrase "unrealized profit" was unreasonable. In interpreting the net capital rule, the Commission is charged with the paradoxical task of measuring something that does not yet exist: the "unrealized profit" on a transaction that has not yet occurred. Because it is not possible to know in advance what the dealer's profit will actually be, the rule makes it necessary for the Commission to anticipate the profit by relying on factors that can be measured at the time. The Commission chose to do this by counting the firm's concession on the transaction as its net profit. This measure is necessarily only an approximation of actual profits, omitting several other factors that will in practice raise or lower the actual profits that a firm realizes on a transaction. For example, it does not include the sales commissions normally paid by a firm to its salesmen, which reduce the actual profit from a transaction below the amount of the concession. At the same time, it excludes from profits any unallocated expense allotment for a transaction, much of which might ultimately end up as profit for the firm. Still, we believe that the Commission's approach is a reasonable one. Furthermore, there is no indication that the Commission has ever interpreted the phrase differently. Despite the necessary inexactitude, we are unable to find that the Commission abused its discretion in arriving at the interpretation it did.

Petitioners challenge their censure and fine on two additional and related grounds. They contend that the SEC's decision improperly relied upon a "secret" interpretation of its rule, *see* 5 U.S.C. § 553(b)(A), and that the Commission violated the Freedom of Information Act (FOIA) provisions of the APA, 5 U.S.C. § 552(a)(1), by failing to publish its interpretation of "unrealized profit." We do not agree with petitioners' contention that the SEC acted improperly by the standard of either § 552 or § 553 of the APA.

The rulemaking provision of the APA requires agencies to publish in advance only substantive rules. It expressly excludes from the publishing requirement "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). The interpretation at issue in the instant case clearly falls within this statutory rubric. It "only explain[ed] what the more general terms of the Act and regulations

already provide." *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983). As such, it was not a substantive rule and the Commission was not legally obligated to publish it in advance.

The FOIA provisions of the APA by their own terms apply to "substantive rules of general applicability," "statements of general policy," and "interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). The Commission's interpretation of the phrase "unrealized profit" was none of these. We have noted above that the interpretation was not a substantive rule. Neither was it a "statement of general policy" or an interpretation of "general applicability." An interpretation is not of "general applicability" if "(1) only a clarification or explanation of existing laws or regulations is expressed; and (2) no significant impact upon any segment of the public results." *Anderson v. Butz*, 550 F.2d 459, 463 (9th Cir.1977) (citation omitted). The Commission's interpretation of the phrase merely explained an already existing regulation; it did not "adopt new rules or substantially modify existing rules, regulations, or statutes." *Lewis v. Weinberger*, 415 F.Supp. 652, 659 (D.N.M.1976). As such the Commission was not required to publish it in advance.

Nevertheless, although we hold that the Commission did not abuse its discretion in interpreting the phrase "unrealized profit" for the first time at an adjudication, we do not mean to say that its timing in this regard was ideal. The question of the precise meaning of this phrase is one that the Commission could and should have anticipated. To resolve it authoritatively for the first time in an adjudicatory proceeding in which a party is substantively and adversely affected is not a model of procedural fairness. *Cf. Nicholson v. Brown*, 599 F.2d 639, 648 (5th Cir.1979) ("[T]he application to a case of new principles announced in the course of deciding that case may be so tinged with unfairness as to amount to an abuse of administrative discretion.") But in any case, the petitioners were remiss in proceeding with the USEG underwriting without seeking a clarification of the meaning of the term and ensuring that they were in compliance with the net capital rule. This lapse, however, and the enforcement proceeding that ensued, did not call into question the integrity or character of the petitioners, as evidenced by the mild sanction imposed. Nevertheless, because we have found that the Commission's interpretation was a reasonable one, we affirm both its holding that petitioners violated the rule and the sanctions imposed.

The petition for review is DENIED.