SUGAR CANE GROWERS COOP-
ERATIVE OF FLORIDA, et
al., Appellants,

v.

Ann M. VENEMAN, in her official ca-
pacity as Secretary of the United
States Department of Agriculture, et
al., Appellees.

No. 01–5335.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 2002.

Decided May 10, 2002.

Raymond B. Ludwiszewski argued the cause for appellants. With him on the briefs were Peter E. Seley and Hassan A. Zavareei.

David J. Ball, Jr., Assistant United States Attorney, argued the cause for appellees. With him on the brief were Roscoe C. Howard, Jr., United States Attorney, and R. Craig Lawrence, Assistant United States Attorney.

William Bradford Reynolds and John F. Bruce were on the brief for amicus curiae United States Beet Sugar Association in support of appellees.

Before: TATEL and GARLAND, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SILBERMAN.

SILBERMAN, Senior Circuit Judge:

Sugar Cane Growers Cooperative of Florida, Florida Crystals Corporation, and Refined Sugars, Inc., appeal from the district court's grant of summary judgment holding that appellants lacked standing. The court dismissed their claims that the United States Department of Agriculture failed to comply with the Administrative Procedure Act[1] and the Food Security Act of 1985[2] in implementing a payment-in-kind program for the 2001 sugar crop by press release. We think appellants have demonstrated standing and because the Department did not comply with the APA or the Food Security Act, we reverse the district court's grant of summary judgment and remand to that court to in turn remand to the Department.

---

**1.** 5 U.S.C. §§ 551–559, 701–706.

## I.

In the United States, sugar production, which the government supports through a variety of programs, is about evenly divided between sugar cane and sugar beet production. This suit involves the Department's choice of a particular method of support. Appellants are self-described small-, medium- and large-sized sugar cane growers, processors, refiners and marketers, who together make up a "significant" portion of the total domestic sugar cane production, which mostly occurs in the Gulf Belt and Hawaii. Sugar beets grow primarily in the North and West, and sugar beet farmers tend to harvest significantly fewer acres per producer than sugar cane farmers. The Department supports sugar production through a program of non-recourse loans; if the market price of sugar drops below the forfeiture price, producers may forfeit their crops to the Department in satisfaction of these loans rather than try to repay in cash, which effectively guarantees a minimum price for harvested and processed sugar. With the low sugar prices over the past several years, the Department has accumulated more than 700,000 tons of sugar, for which it pays approximately $1.35 million per month in storage fees. The presence of that potential supply (or "overhang") may depress somewhat sugar prices and it exacerbates the problem of limited sugar storage, which is particularly troublesome for sugar beet farmers.

The Food Security Act gives the Department authority to implement a payment-in-kind (PIK) program for sugar, which it did for sugar beet farmers in August 2000. For the 2000 PIK program, sugar beet farmers submitted bids to the Department

---

**2.** 7 U.S.C. § 1308a.

offering to destroy (or "divert") a certain amount of their crops in return for sugar from USDA storage. A farmer's bid is his asking price for that amount of destruction; the price is expressed in terms of a percentage of the three-year average value of the crop yield for the acreage diverted. Thus, a farmer bidding 80 percent would receive eight dollars for every acre destroyed if an average acre of their farm produced ten dollars worth of sugar. In fact, the average bid was approximately 84 percent and resulted in the distribution of about 277,000 tons of government sugar and the diversion of approximately 102,000 acres. Participants were prohibited from participating in future PIK programs if they increased their acreage planted with sugar beets over 2000 levels. The Agency did not proceed by notice and comment, but no party challenged that decision or the program itself.

Appellants claim the 2000 PIK program unfairly provided participants with below-harvest-cost government sugar which gave them a competitive advantage over appellants. And they claim that the program depressed sugar prices. Actually, the price of sugar rose, but it is not clear what caused the increase. According to appellants, although initial forecasts predicted that the diverted acreage would lead to lower sugar crop volume in 2000, subsequent forecasts increased substantially in the months following implementation of the PIK program—to 23.6 tons per acre in December 2000 from 22.8 tons per acre before August 2000. Appellants contend that the yield increase (or "yield slippage") resulted in part from farmers taking their lowest-yielding crops out of production for the PIK program. With the yield slippage, additional beet sugar supplies ended up on the market, and PIK farmers received more sugar through the program than they would have if they had produced sugar on the diverted acres. And the

greater supplies of sugar, it is argued, necessarily depressed sugar prices below that which would otherwise have obtained. The government insists that the program had a positive effect on the price of sugar, at least in part because it reduced the government's sugar supply and storage fees, ameliorating the overhang effect and storage scarcity problem.

In January 2001, the Department met with interested persons (including representatives of appellants) and indicated that while it was considering a PIK program for the 2001 sugar crop, it would not do so without notice and comment. The Agency also asked those present about the effectiveness of the 2000 PIK program and their thoughts on the desirability and structure of a potential 2001 program. Appellants claim that they were unable to comment satisfactorily because the data on the 2000 program was not yet available. Before August 2001, Department employees had approximately a dozen contacts with sugar industry representatives regarding the possibility of a 2001 program.

The Department announced by an August 31, 2001 press release, however, that it was implementing a PIK program for the 2001 sugar crop without using APA rulemaking. The Agency followed that announcement a week later with a "Notice of Program Implementation" in the September 7, 2001 Federal Register. For the 2001 PIK program, the Department set a 200,000 ton limit in order to encourage more competitive bidding and made both beet and cane sugar producers eligible. But a statutory restriction limiting payments to $20,000 per producer effectively eliminated appellants' opportunity to participate because of their size. Particularly troubling appellants, the government waived its 2000 PIK program restriction on future eligibility by participants who had increased their crop acreage; it mere-

ly included a similar restriction on 2001 participants. In contrast to the 2000 PIK program, in which the government disbursed all of the allotted sugar at the same time, in 2001 the Department indicated that it would stagger disbursement. After announcing the program, the Department received more than 6,000 bids and accepted 4,655 bids, some as high as 87.9931 percent. The final data on bids is not a part of the summary judgment record, nor is the disbursement schedule.

■ Appellants filed suit shortly after the press release appeared, seeking injunctive and declaratory relief. They argued that the Department did not comply with the APA because it promulgated a rule without notice-and-comment rulemaking; that it violated the Food Security Act of 1985 by not making required findings; and that the Department violated the Regulatory Flexibility Act[3] because it did not consider the impact of the program on small businesses. It was argued that the 2001 PIK program caused appellants two injuries: first, it gave participants a competitive advantage by providing them with below-harvest-cost sugar; second, it had a depressive effect on prices.

The district court, with the agreement of the parties, converted appellants' motion for preliminary injunctive relief into a summary judgment motion. The court concluded that appellants failed to establish standing on two grounds: first, they had not shown an injury-in-fact; second, they had not established causation because they had not demonstrated that the Department would have decided against im-

plementing the program following notice and comment. The court nevertheless decided the merits, holding that the 2001 PIK program was a rule subject to notice-and-comment procedures, but the Department's failure to comply with those procedures was harmless. Appellants' Food Security Act and Regulatory Flexibility Act claims were not addressed.

## II.

We, of course, begin with standing. Appellants claim that the Department gave sugar beet farmer participants a competitive advantage by giving them below-harvest-cost sugar. Participants will use that competitive advantage to capture market share and customer good will, or so the argument goes. The government responds by pointing out (and appellants do not dispute) that refined sugar is a commodity market. In light of that, appellants have not explained how any cost advantage participants could gain would translate into a meaningful competitive advantage.[4]

■ On the other hand, appellants are on much sounder economic ground in claiming that the PIK program had a depressive effect on sugar prices—which would have clearly injured appellants. They produced an affidavit from Brian O'Malley and studies by two independent industry analysts, each of which indicated that the PIK programs have harmed appellants. O'Malley, who has spent over 20 years in the refined sugar industry, testified that Refined Sugars suffered at least

---

3. 5 U.S.C. § 601 *et seq.* On appeal, appellants failed to raise their Regulatory Flexibility Act claim—a footnote at the end of their opening brief does not suffice. We therefore do not reach the government's argument that appellants, primarily large producers, lack prudential standing to raise such a claim.

4. We dismiss appellants' unsubstantiated argument that sugar beet farmers will use the PIK program to access stores of refined sugar cane—an argument predicated on the unproven (and dubious) proposition that there is a difference between refined sugar cane and refined sugar beet.

part of its $22 million loss last year as a result of the government "flooding" the market with 277,000 tons of PIK sugar. The Sparks Companies, Inc. concluded that the 2000 PIK program resulted in "a substantial amount of yield slippage," which meant more sugar on the market and thereby depressed prices. Similarly, Gregory Harnish, a research analyst for Sparks Companies, concluded in a different report that the 2000 PIK program "increased free supplies of sugar due to a substantial amount of slippage and the timing of USDA's release of PIK sugar." And the government, in an internal options memorandum, acknowledged that "some analysts believe that the 2000 PIK was, at least partially, responsible for the yield increase."

The government's response to this injury claim was to demonstrate that after the PIK program sugar prices went up, not down, so appellants could not have been injured. This led the district court to conclude that appellants' injury was speculative. But the government's contention is a snare because the relevant question is not whether sugar prices actually went up or down but whether the PIK program had a depressive effect. A number of other factors led to reduced supply and thereby presumably an increased price. For instance, the Federal Circuit limited the import of "foreign stuffed molasses," a product that was allegedly used by Canadian producers to export sugar into this country. Similarly, the Department adjusted the Mexican sugar quota and eliminated 200,000 tons of imported sugar. The government does not really dispute appellants' claim that because of the "yield slippage" (that appellants contend the PIK program induced) more sugar was produced than would otherwise be in the market. Indeed, the government had no response to appellants' particular argument that the Department's waiver of disqualifications

for those producers who, contrary to the 2000 restrictions had increased their acreage, would inevitably lead to more sugar production. Prior violators would presumably continue their practice.

In sum, appellants have made a *prima facie* showing that the PIK program caused them injury by increasing the supply of U.S. sugar. To be sure, the government suggests that even an increase in the direct supply of sugar would not have had a depressive effect on prices because the PIK program at least depleted sugar stores, thereby reducing what could be thought an ancillary supply (the overhang). It seems rather doubtful to us that the amount of government sugar in storage would have anywhere near the effect on prices as would sugar available for sale. In any event, the government never sought a hearing on that issue nor on its dispute of appellants' affidavits and studies, the credibility of which it attacked; instead, like appellants, it moved for summary judgment. Since appellants presented a *prima facie* claim of injury based on basic economic logic (as set forth and supported in the contested affidavits and studies), it was the government's burden, if it wanted a trial on the question of sugar price movements, to seek a factual hearing. Because it did not, we think appellants established injury.

■ The district court's alternative ground that appellants lack standing because "it is not at all clear that the Department would have decided against the PIK program had it received [appellants'] additional comments" simply misstates the law. A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural

step was connected to the substantive result. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 7, 112 S.Ct. 2130, 2143 n. 7, 119 L.Ed.2d 351 (1992), the Supreme Court explained that an individual living next to a federally licensed dam "has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered." *See also Florida Audubon Society v. Bentsen*, 94 F.3d 658, 669 (D.C.Cir.1996) (en banc). If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter.

## III.

■ Turning to the merits, we take up first appellants' APA claim. The APA sets forth several steps an agency must take when engaged in rulemaking: it must publish a general notice of proposed rulemaking in the Federal Register; give an opportunity for interested persons to participate in the rulemaking through submission of written data, views, or arguments; and issue publication of a concise general statement of the rule's basis and purpose. 5 U.S.C. § 553(b), (c). The government defends the Department's failure to engage in notice-and-comment rulemaking by asserting the PIK announcement was not really a rule and, even if it were, the

failure to engage in rulemaking was a harmless error.[5]

The APA defines a rule very broadly as the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). We have recognized that notwithstanding the breadth of the APA's definition an agency pronouncement that lacks the firmness of a proscribed standard—particularly certain policy statements—is not a rule. *See Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C.Cir. 1997). *Compare also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021–22 (D.C.Cir.2000), *with Tozzi v. HHS*, 271 F.3d 301, 312–13 (D.C.Cir.2001) (Silberman, J. concurring). (Of course, general statements of policy are exempt from notice-and-comment procedures anyway. 5 U.S.C. § 553(b)(A)). But the government does not claim that its package of announcements is a policy statement. Instead, the government argues that because the announcement of the 2001 PIK program was an "isolated agency act" that did not propose to affect subsequent Department acts and had "no future effect on any

---

**5.** Although the government also implies that it had good cause not to follow notice-and-comment rulemaking, it does not rely on that position, presumably because the Department did not assert it. Nor do we address amicus' argument that the 2001 PIK program was exempt from APA rulemaking requirements under 5 U.S.C. § 553(a)(2) because it consti-

tutes agency action relating to "public property, loans, grants, benefits, or contracts." As the Department acknowledged, it has essentially waived that APA exemption. *See* 36 Fed.Reg. 13,804 (July 24, 1971); *Rodway v. United States Dep't of Agric.*, 514 F.2d 809, 814 (D.C.Cir.1975).

other party before the agency" it was not a rule. (Quoting *Daingerfield Island Protective Soc'y v. Babbitt*, 823 F.Supp. 950, 957 (D.D.C.), *aff'd in relevant part*, 15 F.3d 1159 (D.C.Cir.1993)). The government would have us see its announcement of the PIK program as analogous to an agency's award of a contract pursuant to an invitation of bids or an agency's decision to approve an application or a proposal—in administrative law terms an informal adjudication (which is the technical term for an executive action). *See, e.g., United States v. Mead Corp.*, 533 U.S. 218, 239 n. 1, 121 S.Ct. 2164, 2168 n. 1, 150 L.Ed.2d 292 (Scalia, J., dissenting).

We have little difficulty—as did the district court—in rejecting this argument. The August 31 press release, the September Questions and Answers and most notably the September 7 Notice of Program Implementation set forth the bid submission procedures which all applicants must follow, the payment limitations of the program, and the sanctions that will be imposed on participants if they plant more in *future* years than in 2001. It is simply absurd to call this anything but a rule "by any other name."[6]

As a variation on the government's second standing argument—that appellants have not demonstrated injury because they cannot show that if the Department had acted pursuant to section 553 the result would have been altered—the government alternatively claims harmless error. We are told that appellants cannot identify any additional arguments they would have made in a notice-and-comment procedure that they did not make to the Department in the several informal sessions. And we are reminded that the De-

partment did make certain changes to the 2001 PIK program in response to appellants' concerns. It is true that we have recognized certain technical APA errors as harmless. For example, in *Sheppard v. Sullivan*, 906 F.2d 756, 761–62 (D.C.Cir. 1990), a challenge to an agency adjudication in a benefits case, we held that a failure to undertake formal notice and comment with respect to a program manual was harmless. But, in so doing, we applied the standard set out in *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1324 (D.C.Cir.1988), under which an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure. And in *Sheppard*, we initially observed that the agency did not even rely on that program manual in its challenged order; furthermore, we expressly concluded that the agency's substantive approach was "the only reasonable one." *Sheppard*, 906 F.2d at 762. *See also First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C.Cir.2000) (holding that agency's failure to give adequate notice was harmless because the final rule was a logical outgrowth of the proposed rule).

Here the government would have us virtually repeal section 553's requirements: if the government could skip those procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated. The government could avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, would not be obliged to set forth a statement of the

---

**6.** The government's suggestion that because participation in the program is "voluntary" the announcement and accompanying documents should not be considered a rule is not worth a response. Similarly, the notion that the government "essentially complied with section 553 of the APA" borders on the frivolous.

basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.

In any event, although they need not have, appellants have indicated additional considerations they would have raised in a comment procedure. For example, they would have argued that the Agency should have bound itself to a gradual disbursement of the sugar, rather than merely allowing itself that option. And, they would have challenged the Department's decision to waive the 2000 PIK program restriction on participants who had increased their acreage.

In their final claim, appellants argue that the Department violated the Food Security Act because the Secretary did not make four required findings before implementing a PIK program. *See* 7 U.S.C. § 1308a. Section 1308a(a) requires the Secretary to consider whether an action "will reduce the total of the direct and indirect costs to the Federal Government of a commodity program administered by the Secretary" but "without adversely affecting income to small- and medium-sized producers participating in such program." Section 1308a(e) requires the Secretary to find that "changes in domestic or world supply or demand conditions have substantially changed after announcement of the program for that crop," and "without action to further adjust production, the Federal Government and producers will be faced with a burdensome and costly surplus."[7]

▆ In response, the Department directs our attention to the Federal Register Notice of Implementation, in which it "expressly refers" to each of the required

findings, and argues that this reference is sufficient. That too is absurd. Referencing a requirement is not the same as complying with that requirement. The Department then turns to the *post hoc* affidavit of Thomas Hunt Shipman, the Deputy Under Secretary for Farm and Foreign Agricultural Services. But the declaration merely states that Shipman "participated" in the decision, not that he was the final decisionmaker. Shipman is not the Secretary of Agriculture, and there is no evidence on either the administrative or summary judgment record that the Secretary delegated decisionmaking authority to Shipman. The internal options memoranda the government also relies on suffer the same fatal defect. The record is devoid of any evidence that the Secretary, or a Department employee with final decisionmaking authority, ever complied with section 1308a.

In sum, this government argument has no more substance than the second standing argument.

\* \* \* \*

▆ There remains the question of remedy. Normally when an agency so clearly violates the APA we would vacate its action—in this case its "non-rule rule"—and simply remand for the agency to start again. Unfortunately, because we denied preliminary relief in this case, the 2001 program was launched and crops were plowed under. The egg has been scrambled and there is no apparent way to restore the status quo ante. Appellants suggested that if we were to vacate, the Federal Court of Claims would have the responsibility of allocating damages. But that seems an invitation to chaos. Moreover, although the government did not—

---

**7.** Appellants also claim that the Department could not have made three of the four find-

ings. We need not decide that now.

and could not have for the first time on appeal—assert a good cause for omitting notice and comment, it is at least possible that the Department could establish good cause because of timing exigencies.

Appellants insist that we have no discretion in the matter; if the Department violated the APA—which it did—its actions must be vacated. But that is simply not the law. Instead, "[t]he decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C.Cir. 1993) (quoting *International Union UMW v. FMSHA*, 920 F.2d 960, 966–67 (D.C.Cir. 1990)). We have previously remanded without vacating when the agency failed to follow notice-and-comment procedures. *See, e.g., Fertilizer Institute v. EPA*, 935 F.2d 1303, 1312 (D.C.Cir.1991); *see also American Medical Ass'n v. Reno*, 57 F.3d 1129 (D.C.Cir.1995); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C.Cir.1999) (remanding without vacating because the panel did not perceive any "rare circumstances" that would warrant a break from that "established administrative practice").

Accordingly, we reverse the district court's grant of summary judgment and remand to that court to in turn remand to the Department.

*So ordered.*