United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 5, 2002 Decided January 21, 2003 

 No. 01-1266

 Sprint Corporation, et al.,
 Petitioners

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 American Public Communications Council, Inc., et al., 
 Intervenors

 Consolidated with 
 Nos. 01-1521, 01-1522, 02-1041, 02-1042

 On Petitions for Review of Orders of the 
 Federal Communications Commission

 David P. Murray argued the cause for petitioners. With 
him on the briefs were H. Richard Juhnke, John E. Benedict, 

Randy J. Branitsky, Thomas F. O'Neil III, William Single 
IV, Jodie L. Kelley, Mark C. Rosenblum and Daniel Meron. 
Kurt W. Hague, David L. Lawson and Peter D. Keisler 
entered appearances.

 Joel Marcus, Counsel, Federal Communications Commis-
sion, argued the cause for respondents. With him on the 
briefs were Robert B. Nicholson and Robert J. Wiggers, 
Attorneys, U.S. Department of Justice, John A. Rogovin, 
Deputy General Counsel, Federal Communications Commis-
sion, and John E. Ingle, Deputy Associate General Counsel. 
Lisa E. Boehley, Counsel, entered an appearance.

 Albert H. Kramer argued the cause for intervenors Ameri-
can Public Communications Council, et al. With him on the 
brief were Robert F. Aldrich, Michael K. Kellogg, Aaron M. 
Panner, Roger K. Toppins, Gary L. Phillips, James D. Ellis, 
Michael E. Glover, Edward Shakin, and James G. Harral-
son. Edward G. Modell entered an appearance.

 Before: Ginsburg, Chief Judge, and Rogers and Tatel, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: Sprint Corp., AT&T Corp., and 
Worldcom, Inc. (collectively, "Sprint"), petition for review of a 
Federal Communications Commission rule governing the 
means by which payphone service providers are compensated 
for certain calls made from their payphones. Sprint contends 
that the rule was promulgated in violation of the notice and 
comment requirements of the Administrative Procedure Act 
("APA"), 5 U.S.C. s 553(b) (2000), and is also arbitrary and 
capricious. Because the Commission failed to provide ade-
quate notice and opportunity to comment, we grant the 
petition and remand the case to the Commission.

 I.

 Section 276(b)(1)(A) of the Telecommunications Act of 1996 
("1996 Act") directs the Federal Communications Commission 

to "establish a per call compensation plan to ensure that all 
payphone service providers ["PSPs"] are fairly compensated 
for each and every completed intrastate and interstate call 
using their payphone...." 47 U.S.C. s 276 (2000). Two 
types of calls may be placed from a payphone. The first and 
most common type is the "coin call," in which the caller 
inserts a coin directly into the payphone before making the 
call; the rates for coin calls are set by State commissions. At 
issue here is the second type of call--"coinless calls"--which 
a caller places by using a service such as directory assistance, 
operator service, an access code, or a subscriber 800 number.

 The Commission explains in its brief that when a caller 
places a coinless payphone call, the call is initially received by 
the local exchange carrier ("LEC") that services the pay-
phone. If the call is local, the LEC completes the call itself; 
if it is long distance, the LEC routes the call to a long-
distance carrier, typically an interexchange carrier ("IXC"). 
The IXC, such as Sprint, AT&T, and Worldcom, is the first 
facilities-based carrier to receive the call. If the recipient of 
the call is a customer of the IXC, the IXC will simply 
transmit the call to the LEC that serves the customer; the 
IXC is thereby able, Sprint acknowledges, to "track" comple-
tion of the call. If the call recipient is not a customer of the 
IXC, however, the IXC transfers the call to a "reseller" of the 
IXC's services. Two types of resellers exist. The first, 
known as switchless resellers, do not possess their own 
switching facilities and must rely on an IXC to perform the 
switching and transmission functions that are required to 
complete a call. When the IXC transfers the call to a 
switchless reseller, the IXC handles the call as if it were 
transferring it to one of its own customers, and the IXC is 
again able to track the call to completion. By contrast, the 
second type, switch-based resellers ("SBRs"), possess their 
own switching capacities; hence, when an IXC routes a call to 
an SBR, the SBR assumes control of the call, and, Sprint 
asserts in its brief, the IXC can no longer track the call to 
completion. As the parties acknowledge, in some instances 
the SBR transfers the call to another SBR, which in turn 
routes the call to yet another SBR, and so on.

 In 1996, the Commission issued a Notice of Proposed 
Rulemaking ("NPRM") proposing a method for compensating 
PSPs for coinless calls. Notice of Proposed Rulemaking, 11 
F.C.C.R. 6716 (1996). A summary of this NPRM was also 
published in the Federal Register. 61 Fed. Reg. 31,481. 
After a period of notice and comment, the Commission deter-
mined that "the primary economic beneficiary" should bear 
the burden of both tracking coinless payphone calls to com-
pletion and compensating PSPs for those calls. Payphone 
Docket, Report and Order, 11 F.C.C.R. 20,541, 20,584 p 83 
(1996) ("First Payphone Order"). The Commission therefore 
concluded that the IXC, or the "underlying, facilities-based 
carrier," should, as the primary economic beneficiary, com-
pensate the PSP "in lieu of a non-facilities-based carrier that 
resells services." Id. at 20,586 p 86. The Commission did not 
define the terms "facilities-based carrier" or "reseller." The 
Commission determined, in response to petitions for reconsid-
eration or clarification, that SBRs possess the switching 
capabilities necessary to track payphone calls and accordingly 
clarified that SBRs are "facilities-based carriers" within the 
meaning of the initial rule. Payphone Docket, Order on 
Reconsideration, 11 F.C.C.R. 21,233, 21,277 p 92 (1996) 
("First Reconsideration Order").

 As facilities-based carriers, then, SBRs were obligated 
under the First Reconsideration Order to compensate PSPs 
for all completed coinless payphone calls they handled. Id. 
IXCs, in turn, were required to compensate PSPs only for 
those calls that the IXCs terminated on their own behalf or 
on behalf of a switchless reseller, and not for those calls the 
IXCs transferred to an SBR. Id. The Commission's Com-
mon Carrier Bureau ("Bureau"), in granting, two years later, 
a waiver to IXCs that had not complied with the First 
Payphone Order within the required one-year period, further 
clarified that IXCs must provide requesting PSPs with infor-
mation about the SBRs to which the IXCs route their calls so 
that the PSPs could identify precisely which SBRs owed them 
compensation. Payphone Docket, Mem. Opinion and Order, 
13 F.C.C.R. 10,893, 10,915-16 p 38 (1998). On review, the 
court upheld the portions of the Commission's 1996 rules that 

are pertinent here. Illinois Pub. Telecomms. Ass'n v. FCC, 
117 F.3d 555, 566-67 (D.C. Cir. 1997).

 In 1999, a coalition of the largest PSPs ("Coalition") 
submitted to the Commission a petition for clarification of the 
payphone compensation orders ("Coalition Petition"). The 
Coalition requested that the Commission "clarify, on a going-
forward basis, which interexchange carrier is the party re-
sponsible for payment of per-call compensation when a dial-
around or subscriber call is made from a payphone." The 
Coalition explained that "[t]he Commission's effort to assign 
this obligation" jointly to IXCs and SBRs "has led to dis-
agreements among PSPs and IXCs, and has encouraged some 
IXCs to shirk their payment responsibilities. This has in 
turn contributed to a serious shortfall in payments of per-call 
compensation." The Coalition suggested that "the best way 
to reduce the shortfall would be to place the obligation for 
payment of per-call compensation on the entity identified by 
the Carrier Identification Code ('CIC') used to route the 
compensable call from the Local Exchange Carrier's net-
work."

 In April 1999, the Common Carrier Bureau issued a "Public 
Notice" seeking "comment on the issues raised in [the Coali-
tion Petition's] request for clarification for payment responsi-
bility of per-call compensation when a dial-around or sub-
scriber call[ ] [is] made from a payphone." Common Carrier 
Bureau Seeks Comment on the RBOC/GTE/SNET Payphone 
Coalition Petition for Clarification, 14 F.C.C.R. 6476 (1999). 
The Bureau's Notice summarized the Coalition Petition's 
general request for clarification and its suggested method of 
using CICs to identify the entity responsible for compensat-
ing the PSP. Id. The Notice included filing dates for 
comments and reply comments, id., but the Bureau did not 
publish the Notice in the Federal Register or issue a notice of 
proposed rulemaking. Sprint and others filed comments that 
focused mainly on the Coalition's proposal to rely on CICs, 
with little discussion of the general method of requiring both 
IXCs and SBRs to compensate PSPs for coinless payphone 
calls. Sprint also registered a procedural objection, in a 
letter to the Bureau, noting that the Commission could sub-

stantively alter the existing compensation rules only after 
providing notice and an opportunity for comment.

 Two years after the Bureau issued its Notice, however, the 
Commission largely jettisoned the approach adopted in the 
First Reconsideration Order. In the Second Order on Re-
consideration, 16 F.C.C.R. 8098 (2001) ("Second Reconsidera-
tion Order"), the Commission stated that it was "revis[ing]" 
and "modify[ing]" its "rules to address the difficulty which 
PSPs face in obtaining compensation for coinless calls placed 
from payphones which involve a switch-based telecommunica-
tions reseller in the call path." Id. at 8098 p 1. Declining to 
adopt the Coalition's proposed method of using CICs to 
identify the carrier responsible for compensating the PSP, id. 
at 8107 p 22, the Commission instead shifted the burden of 
tracking all calls to completion and compensating PSPs to the 
IXCs alone, while permitting the IXCs to recover these costs 
from the SBRs to which they transferred the calls. Id. at 
8098 p 2, 8106 p 18. The Commission explained that the IXCs 
were in the best position to track calls and to make reporting 
a condition of their contracts for providing services. Id. at 
8105 p 16. The Commission also broadened IXCs' reporting 
obligations to require IXCs to inform each PSP of the volume 
of calls for each access-code and 800 number that the IXC 
received from that PSP's payphones. Compare First Pay-
phone Order, 11 F.C.C.R. at 20,596 p 110, with Second Recon-
sideration Order, 16 F.C.C.R. at 8106 p 18. Finally, the 
Commission noted that PSPs could continue to arrange alter-
native compensation schemes through private contracts with 
IXCs and SBRs. Second Reconsideration Order, 16 F.C.C.R. 
at 8106-07 p 19. The Commission amended its regulations to 
reflect these changes. See 47 C.F.R. ss 64.1300, 64.1310 
(2001). Denying reconsideration, the Commission rejected 
the IXCs' objections to the new rule. Third Order on 
Reconsideration and Order on Clarification, 16 F.C.C.R. 
20,922 (2001). Sprint now petitions the court for review.

 II.

 Sprint's contention that the Commission erred by failing to 
issue a new NPRM prior to promulgating a new rule in the 

Second Order on Reconsideration is based on the notice 
requirement of s 553(b) of the APA, which provides in rele-
vant part: "General notice of proposed rule making shall be 
published in the Federal Register, unless persons subject 
thereto are named and either personally served or otherwise 
have actual notice thereof in accordance with law." 5 U.S.C. 
s 553(b). The court has observed that the notice require-
ment of the APA does not simply erect arbitrary hoops 
through which federal agencies must jump without reason. 
Rather, the notice requirement "improves the quality of 
agency rulemaking" by exposing regulations " 'to diverse 
public comment,' " ensures " 'fairness to affected parties,' " 
and provides a well-developed record that "enhances the 
quality of judicial review." Small Refiner Lead Phase-Down 
Task Force v. United States EPA, 705 F.2d 506, 547 (D.C. 
Cir. 1983) (citations omitted). In contrast to an informal 
adjudication or a mere policy statement, which "lacks the 
firmness of a [prescribed] standard," an agency's imposition 
of requirements that "affect subsequent [agency] acts" and 
have a "future effect" on a party before the agency triggers 
the APA notice requirement. Sugar Cane Growers Coop. v. 
Veneman, 289 F.3d 89, 95-96 (D.C. Cir. 2002) (internal quota-
tions and citation omitted).

 At the same time, agencies possess the authority in some 
instances to clarify or set aside existing rules without issuing 
a new NPRM and engaging in a new round of notice and 
comment. For example, in City of Stoughton v. United 
States EPA, 858 F.2d 747, 751 (D.C. Cir. 1988), the court held 
that the EPA was not required to engage in a new round of 
notice and comment where it merely adjusted a score under 
the Comprehensive Environmental Response, Compensation 
and Liability Act of 1980, Pub. L. No. 96-510, 94 Stat. 2767, in 
response to public comments. The authority to clarify or 
reconsider a rule may arise directly from a statute, as in the 
Natural Gas Act, see Tennessee Gas Pipeline Co. v. FERC, 
871 F.2d 1099, 1108 (D.C. Cir. 1989), or pursuant to agency 
rulemaking authority, as in the case of the Commission, 
whose procedures authorize it to set aside an existing rule, on 

its own motion, within thirty days of promulgating the rule. 
FCC Practice and Procedure, 47 C.F.R. s 1.108 (2001).

 Underlying these general principles is a distinction between 
rulemaking and a clarification of an existing rule. Whereas a 
clarification may be embodied in an interpretive rule that is 
exempt from notice and comment requirements, 5 U.S.C. 
s 553(b)(3)(A), see Am. Mining Cong. v. Mine Safety & 
Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993), new 
rules that work substantive changes in prior regulations are 
subject to the APA's procedures. Thus, in National Family 
Planning & Reproductive Health Ass'n v. Sullivan, the court 
described as "a maxim of administrative law" the proposition 
that, " '[i]f a second rule repudiates or is irreconcilable with [a 
prior legislative rule], the second rule must be an amendment 
of the first; and, of course, an amendment to a legislative rule 
must itself be legislative.' " 979 F.2d 227, 235 (D.C. Cir. 
1992) (quoting Michael Asimow, Nonlegislative Rulemaking 
and Regulatory Reform, 1985 Duke L.J. 381, 386); see also 
Am. Mining Cong., 995 F.2d at 1109. The Commission 
proceedings at issue illustrate the distinction. In the First 
Reconsideration Order, the Commission clarified its initial 
rule by providing a definition of the phrase "facilities-based 
carriers." 11 F.C.C.R. at 21,277 p 92 (1996). Although defi-
nitions may vary in a way that would trigger the APA notice 
requirements, see Nat'l Family Planning, 979 F.2d at 235 
(citing Homemakers North Shore, Inc. v. Bowen, 832 F.2d 
408, 412 (7th Cir. 1987)), the Commission's clarification in the 
First Reconsideration Order merely illustrated its original 
intent. By contrast, when an agency changes the rules of the 
game--such that one source becomes solely responsible for 
what had been a dual responsibility and then must assume 
additional obligations, as occurred in the Commission's Sec-
ond Reconsideration Order--more than a clarification has 
occurred. To conclude otherwise would intolerably blur the 
line between when the APA notice requirement is triggered 
and when it is not.

 With these principles in mind, we turn to the Commission's 
position that the APA notice requirement is inapplicable to its 
determinations in the Second Reconsideration Order. The 

Commission concedes that it did not publish a NPRM--or 
even the Bureau's Notice--in the Federal Register. It also 
acknowledges that, because the Bureau's Notice did not spe-
cifically name Sprint, any "actual notice" that the agency 
provided to Sprint does not suffice under s 553(b). See Util. 
Solid Waste Activities Group v. EPA, 236 F.3d 749, 754 (D.C. 
Cir. 2001). Instead, the Commission contends that its deter-
minations in the Second Reconsideration Order did not neces-
sitate a new NPRM and that Sprint in fact received adequate 
notice and opportunity to comment. The Commission offers 
several alternative theories in support of its position.

 First, the Commission maintains that it is permitted sua 
sponte to reconsider its rules where a reconsideration order is 
pending, so long as the original proposed rule supplied notice. 
This principle, however, is inapposite in the context of new 
rulemakings. The Commission points to a regulation that 
authorizes the Commission, "on its own motion," to "set aside 
any action made or taken by it within 30 days from the date 
of public notice of such action...." Practice and Procedure, 
47 C.F.R. s 1.108 (2001). This thirty-day deadline, the Com-
mission maintains, may be tolled by pending motions for 
reconsideration, citing Central Florida Enterprises v. FCC, 
598 F.2d 37, 48 n.51 (D.C. Cir. 1978). But the Commission's 
effort to take refuge in its regulation fails. The court in 
Central Florida merely stated that "where ... several peti-
tions are consolidated for hearing and decision, a petition for 
reconsideration of any of the ensuing orders tolls the thirty 
day period as to all orders in the case." Id. Although 
Central Florida's holding might assist the Commission were 
it merely setting aside an existing rule, in the instant case the 
Commission, more than four years after issuing its original 
rule, changed the payment and reporting obligations of affect-
ed parties. While maintaining that it was merely setting 
aside a previous action, the Commission itself stated in the 
Second Reconsideration Order that it was "revis[ing]" and 
"modify[ing]" its rules. 16 F.C.C.R. at 8098 p 1. Moreover, 
the Commission changed the text of the regulation appearing 
in the Code of Federal Regulations. This stands in contrast 
to the First Reconsideration Order, when the Commission 

simply clarified the definition of a phrase that it had used in 
the initial rule. 11 F.C.C.R. at 21,277 p 92.

 The Commission's reliance on American Mining Congress 
v. United States EPA, 907 F.2d 1179 (D.C. Cir. 1990), is 
similarly unavailing. In that case, the court held that the 
agency had complied with the APA's notice requirements 
where it reinstated a rule that it had withdrawn eight years 
earlier. 907 F.2d at 1182. Because the petitioners had two 
opportunities for notice and comment before the agency 
promulgated the reinstated rule, the court held that "[t]his 
was more than enough to satisfy the requirements of the 
APA." Id. Here, by contrast, the Commission has not 
simply reinstated a previously withdrawn rule, much less the 
rule it promulgated in the First Payphone Order. The rule 
embodied in the Second Reconsideration Order differs from 
the initial rule, which provided that the "underlying, facilities-
based carrier," without defining that term, should compen-
sate the PSPs. First Payphone Order, 11 F.C.C.R. at 20,586 
p 86 (1996). When the Commission later defined the phrase 
in the First Reconsideration Order, it clarified that "facili-
ties-based carriers" include SBRs. 11 F.C.C.R. at 21,277 
p 92 (1996). Thus, the initial rule embodied a dual system of 
payment responsibility involving both the IXCs and the 
SBRs. Because the Second Reconsideration Order departs 
from that understanding and effects a change in the regula-
tion, it is not identical to the initial rule. It also differs from 
the initial rule because the Second Reconsideration Order 
increases the IXCs' reporting obligations substantially be-
yond those contained in the First Payphone Order. 16 
F.C.C.R. at 8106 p 18; see also Miscellaneous Rules Relating 
to Common Carriers, 47 C.F.R. s 64.1310(a) (2001). Given 
the changes to the payment-responsibility requirements, the 
rule promulgated in the Second Reconsideration Order is not 
a reinstatement of the original rule, and consequently nothing 
in American Mining Congress would exempt the Commis-
sion's determinations from the APA notice requirement.

 Second, the Commission maintains that it was not required 
to issue a new NPRM because its determination in the 
Second Reconsideration Order was a "logical outgrowth" of 

the Bureau's Notice. "[A]n agency may make changes in its 
proposed rule on the basis of comments without triggering a 
new round of comments, at least where the changes are a 
'logical outgrowth' of the proposal and previous comments." 
City of Stoughton, 858 F.2d at 751. In order for a final rule 
to be a "logical outgrowth" of a proposal, however, the agency 
first must have provided proper notice of the proposal. "The 
necessary predicate ... is that the agency has alerted inter-
ested parties to the possibility of the agency's adopting a rule 
different than the one proposed." Kooritsky v. Reich, 17 
F.3d 1509, 1513 (D.C. Cir. 1994). Whereas in Kooritsky, id. 
at 1512, and City of Stoughton, 858 F.2d at 749, the agencies 
began their rulemaking processes with NPRMs, here the 
Commission did not publish a notice in the Federal Register. 
Instead, it purported to act through the Common Carrier 
Bureau, which lacks the authority under the Commission's 
regulations to issue notices of proposed rulemaking. Com-
mission Organization, 47 C.F.R. s 0.291(g) (2001). Sprint, 
therefore, was not on notice that the Commission was propos-
ing to "revise" its initial rule, much less that it would shift the 
locus of payment responsibility in any manner other than the 
Coalition Petition's CIC proposal. We leave open the ques-
tion whether adoption of the CIC approach also would have 
necessitated a new NPRM. See Nat'l Family Planning, 979 
F.2d at 235. Suffice it to say, there can be no "logical 
outgrowth" of a proposal that the agency has not properly 
noticed. See McClouth Steel Prods. Corp. v. Thomas, 838 
F.2d 1317, 1323 (D.C. Cir. 1988).

 Third, the Commission maintains that the Coalition Petition 
and the Bureau's Notice placed Sprint on actual notice of the 
new rule, and that this actual notice cures any procedural 
deficiencies in the Commission's promulgation of a new rule. 
But, as noted, the authority delegated to the Bureau by the 
Commission to issue public notices does not extend to issu-
ance of NPRMs, 47 C.F.R. s 0.291(g), and Sprint could 
reasonably assume that the Commission would not undertake, 
as a result of the Bureau's Notice, consideration of more than 
the proposal in the Coalition's Petition. Furthermore, the 
comments submitted in response to the Bureau's Notice 
demonstrate that the parties did not appreciate that the 

Commission was contemplating revision of the dual scheme of 
payment responsibility. Nor did anything in the Bureau's 
Notice suggest that the Commission would impose additional 
reporting requirements on IXCs, and the commenters under-
standably submitted no comments on this point. See MCI 
Telecomms. Corp. v. FCC, 57 F.3d 1136, 1142-43 (D.C. Cir. 
1995). Necessarily, then, the Bureau's Notice did not provide 
"actual notice" sufficient to remedy the Commission's proce-
dural shortcomings.

 In a last gasp, the Commission contends that even if the 
APA notice requirement applied to the Commission's revision 
of the initial rule in the Second Reconsideration Order and 
the Commission failed to follow the requirement, the APA 
incorporates a prejudicial error rule, and Sprint has failed to 
show prejudice from the Commission's procedural shortcom-
ings. The APA instructs that reviewing courts take "due 
account ... of the rule of prejudicial error." 5 U.S.C. s 706. 
In Sugar Cane Growers Cooperative v. Veneman, 289 F.3d 89 
(D.C. Cir. 2002), the court noted the standard established in 
McLouth, 838 F.2d at 1324, and explained that "an utter 
failure to comply with notice and comment cannot be consid-
ered harmless if there is any uncertainty at all as to the effect 
of that failure." Sugar Cane Growers, 289 F.3d at 96. The 
court observed that broadening the harmless error rule would

 virtually repeal section 553's requirements: if the gov-
 ernment could skip those procedures, engage in informal 
 consultation, and then be protected from judicial review 
 unless a petitioner could show a new argument--not 
 presented informally--section 553 obviously would be 
 eviscerated. The government could avoid the necessity 
 of publishing a notice of a proposed rule and perhaps, 
 most important, would not be obliged to set forth a 
 statement of the basis and purpose of the rule, which 
 needs to take account of the major comments--and often 
 is a major focus of judicial review.
 
Id. at 96-97.

 The same dangers are present here. First, as noted, the 
Commission's description of its determination in the Second 

Reconsideration Order as a "revis[ion]" and "modif[ication]" 
of its rules, as well as the Commission's amendment of its 
regulations, indicates that more than a clarification of the 
initial rule was involved. This fact alone may have prejudiced 
Sprint insofar as it is procedurally more difficult to obtain 
reversal of a new rule than to petition for reconsideration of a 
clarification. Cf. Stuart-James Co. v. SEC, 857 F.2d 796, 801 
(D.C. Cir. 1988). Second, although a showing of actual preju-
dice is not required under the prejudicial error rule, Sprint 
has made a colorable claim that it would have more thorough-
ly presented its arguments had it known that the Commission 
was contemplating a rulemaking. See Sugar Cane Growers, 
289 F.3d at 97. The Second Reconsideration Order assumes, 
for example, that the IXCs are in a superior position to track 
calls because they may use their market leverage to impose 
client reporting requirements as a condition of service. IXCs 
might have been able to affect this determination (notwith-
standing the Commission's view that the technology exists for 
IXCs to track calls) by presenting additional information 
demonstrating shortcomings and burdens that the Commis-
sion had not adequately considered. Without notice of the 
Commission's assumption that IXCs alone were in a superior 
position, however, the IXCs had no opportunity to present 
their evidence. Third, the Commission provided inadequate 
notice that it was considering a change in reporting require-
ments, which under the new rule are more burdensome than 
in the initial rule. Under the circumstances, the Commission 
"has offered no persuasive evidence that possible objections 
to its final rule[ ] have been given sufficient consideration." 
Shell Oil v. EPA, 950 F.2d 741, 752 (D.C. Cir. 1991). Thus, 
the effect of the Commission's procedural errors is uncertain, 
and the Commission's "utter failure" to afford proper notice 
and comment was not harmless. Sugar Cane Growers, 289 
F.3d at 96.

 Although the Commission must have flexibility to adjust a 
regulatory scheme as concerns and problems arise in an 
obviously complex and developing area, it must conform its 
conduct to the APA notice requirement. Because the Com-
mission failed to issue a new NPRM to afford proper notice 

and opportunity for comment, we grant the petition and 
remand the case to the Commission. In light of the remand, 
we do not reach Sprint's contention that the rule is arbitrary 
and capricious.