# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued October 13, 2017     Decided December 22, 2017

No. 16-5358

SAFARI CLUB INTERNATIONAL AND NATIONAL RIFLE
ASSOCIATION OF AMERICA,
APPELLANTS

v.

RYAN ZINKE, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE U.S. DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

---

Consolidated with 16-5362

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:15-cv-01026)
(No. 1:14-cv-00670)

---

*Douglas S. Burdin* argued the cause for appellants. With him on the briefs were *Anna M. Seidman*, *Christopher A. Conte*, and *Michael T. Jean*. *Jeremy E. Clare* entered an appearance.

*Avi Kupfer*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were

*Jeffrey H. Wood*, Acting Assistant Attorney General, and *Andrew C. Mergen*, and *Matthew Littleton*, Attorneys.

*Michael Ray Harris* and *Jennifer E. Best* were on the brief for appellees Friends of Animals, et al. *Courtney R. McVean* entered an appearance.

*Tanya Sanerib*, *Sarah Uhlemann*, and *Anna Frostic* were on the brief for *amici curiae* The Humane Society of the United States, et al. in support of defendants-appellees.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: By regulation issued pursuant to the Endangered Species Act ("ESA"), sport-hunted African elephant trophies may only be imported into the United States if, among other things, the U.S. Fish and Wildlife Service ("Service") makes "[a] determination . . . that the killing of the trophy animal will enhance the survival of the species." 50 C.F.R. § 17.40(e)(6)(i)(B) ("Special Rule"). On April 4, 2014, the Service issued a press release stating that the agency lacked sufficient information to support a positive enhancement determination with respect to elephant trophies hunted in Zimbabwe during the 2014 hunting season. The finding, which was subsequently published in the Federal Register, banned the importation of such trophies going forward from the date of the finding. The Service also made negative enhancement findings in July of 2014 and March of 2015, each time concluding that information concerning the size of the Zimbabwean elephant population and status of conservation efforts in Zimbabwe did not support a conclusion

that killing the animal "will enhance the survival of the species." *Id.*

Safari Club International ("Safari Club") and the National Rifle Association ("NRA") (collectively, "Appellants") filed suit in District Court to challenge the 2014 and 2015 findings. Appellants claimed that the agency's actions were arbitrary and capricious under the Administrative Procedure Act ("APA") and violated the ESA because, *inter alia*, in its determinations to ban the elephant imports, the Service impermissibly relied on standards that are more stringent than the statutory requirements in the ESA. The District Court denied Appellants' motion for summary judgment on these claims and granted judgment for the Service. For the reasons explained below, we affirm judgment for the Service on these claims.

Appellants also contended that the Service erred in adopting the 2014 and 2015 enhancement findings without adhering to the notice-and-comment rule-making requirements of the APA. *See* 5 U.S.C. § 553. The District Court rejected this claim on the ground that the enhancement findings were the product of adjudications and, therefore, not covered by the APA's rule-making requirements. The District Court erred on this point. Under the APA, a "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). And as the Supreme Court has explained, rule-making procedures are "used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts." *United States v. Fl. E. Coast Ry. Co.*, 410 U.S. 224, 246 (1973). The enhancement findings in this case fit these definitions of "rule" to a tee. Therefore, the Service erred in adopting the findings without first following the notice-and-comment rule-making requirements of the APA. Accordingly,

we reverse the District Court's grant of summary judgment in favor of the Service on the § 553 claim. The case will be remanded to the District Court with instructions to remand to the Service so that it may initiate rule making to address enhancement findings for the time periods at issue in this case.

## I. BACKGROUND

### A. Statutory and Regulatory Background

#### 1. The CITES Treaty

The United States and Zimbabwe are parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087 ("CITES" or "Convention"). *See* 16 U.S.C. § 1538(c)(1) (incorporating the Convention into U.S. domestic law through the ESA). The Convention regulates the international trade of imperiled species that are listed in its appendices, which include African elephants, or *Loxodonta africana*, from Zimbabwe. *See, e.g.*, *id.* §§ 1537a–1539; 50 C.F.R. § 17.11.

As relevant here, Appendix I lists species that are "threatened with extinction which are or may be affected by trade," CITES art. II(1), 27 U.S.T. at 1092, and Appendix II lists species that may become threatened with extinction unless their trade is regulated, *id.* art. II(2), 27 U.S.T. at 1092. Parties to the Convention may not allow trade in species listed in the appendices except in accordance with the treaty's provisions. *Id.* art. II(4), 27 U.S.T. at 1092.

Appendix I species may be shipped internationally only if both the importing and exporting countries grant permits, which are subject to certain conditions. *Id.* art. III, 27 U.S.T. at 1093–95. Among the requirements for a permit to issue, both

countries must make a "non-detriment" finding, certifying that the trade in threatened species "will not be detrimental to the survival of that species." *Id.* art. III(2)(a), 27 U.S.T. at 1093; *id.* art. III(3)(a), 27 U.S.T. at 1093. Until 1994, the Convention also required an importing country to make an "enhancement finding," a determination that "the killing of the animal . . . would enhance the survival of the species." Retention of Threatened Status for the Continental Population of the African Elephant, 57 Fed. Reg. 35,473, 35,485 (Aug. 10, 1992). The parties to the Convention removed the enhancement finding requirement from the treaty by resolution in 1994.

For Appendix II species, the Convention requires a permit from the exporting country only. CITES art. IV, 27 U.S.T. at 1095–97. While subject to the non-detriment finding requirement, permits for Appendix II species have never been conditioned on the exporting country making an enhancement finding. In 1997, over opposition from the United States, the parties to the Convention transferred African elephants in Zimbabwe from Appendix I to Appendix II. Changes in List of Species in Appendices to the [CITES], 62 Fed. Reg. 44,627, 44,628–29 (Aug. 22, 1997).

It is undisputed that the proscriptions in the Convention are a floor, not a ceiling, for protection of Appendix II species. The treaty "in no way affect[s] the right of Parties to adopt . . . stricter domestic measures regarding the conditions for trade, taking possession or transport of specimens of species included in Appendices I, II, and III, or the complete prohibition thereof." CITES art. XIV(1), 27 U.S.T. at 1108.

2. *The Endangered Species Act*

Congress passed the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44 (2000), to provide for the conservation of

"endangered" and "threatened" species, *id.* § 1531(b); *see id.* § 1532(6) (defining "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range"); *id.* § 1532(20) (defining "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range"). Except in narrow circumstances, the Act generally prohibits the importation of *endangered* species into the United States. *Id.* § 1538(a)(1)(A); 50 C.F.R. § 17.21(b).

For threatened species, section 4(d) requires the Service to "issue such regulations as [it] deems necessary and advisable to provide for the[ir] conservation." 16 U.S.C. § 1533(d). Pursuant to this authority, the Service has promulgated a regulation extending the general import prohibition on endangered species to threatened species. *See* 50 C.F.R. § 17.31(a). The Service reserved the right, however, to create "special rule[s]" regarding threatened species, which "contain all the applicable prohibitions and exceptions" regarding import of that species. *Id.* § 17.31(c). In other words, "the [Service] has, with this regulation, established a regime in which the prohibitions established for endangered species are extended automatically to all threatened species by a blanket rule and then withdrawn as appropriate, by special rule for particular species and by permit in particular situations." *Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5 (D.C. Cir. 1993).

Since 1978, the Service has listed the African elephant as a threatened species under the ESA, *see* Listing of the African Elephant as a Threatened Species, 43 Fed. Reg. 20,499, 20,503 (May 12, 1978); 50 C.F.R. § 17.11(h), and maintained a Special Rule governing its importation, *see* 50 C.F.R. § 17.40(e) ("Special Rule"). In 1992, the Service added a

provision to the Special Rule providing that sport-hunted African elephant trophies may only be imported into the United States under certain conditions, including that the Service must make "[a] determination . . . that the killing of the trophy animal will enhance the survival of the species." *Id.* § 17.40(e)(6)(i)(B). This means that, in the United States, the enhancement finding requirement continues to apply in accordance with the Special Rule under the ESA. The 1994 removal of the enhancement finding requirement from the Convention for the issuance of import permits for Appendix I species "d[id] not supersede import or export requirements pursuant to [the ESA]." 62 Fed. Reg. at 44,633.

The Service maintains the right to make nation-wide enhancement findings *sua sponte*, "on a periodic basis upon receipt of new information on the species' population or management." *Id*. Current findings "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register." *Id.*

Finally, section 9(c)(2) of the ESA provides that "[a]ny importation into the United States" of non-endangered, Appendix II species such as Zimbabwean elephants "shall," where certain conditions are satisfied, "be presumed to be an importation not in violation of any provision of [the ESA] or any regulation issued pursuant to [the ESA]." 16 U.S.C. § 1538(c)(2).

### 3. *The Enhancement Findings*

In 1997, the Service made a positive enhancement finding for sport hunting of African elephants in Zimbabwe. Memorandum, Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe, U.S. Fish and

Wildlife Service (July 2, 1997), *reproduced at* Joint Appendix ("J.A.") 373–76. The Service explained that revenues generated by sport hunting benefited rural communities and elephant conservation programs in Zimbabwe. In addition, Zimbabwe's government had in place conservation and anti-poaching programs to protect the elephants. And "one of the best sets of elephant population data in Africa" indicated that Zimbabwe's elephant population was growing at "about 5% per annum," from 46,000 elephants in 1980 to 66,000 in 1997. J.A. 373–74. Thus, "[b]ased on available information," the Service found that "the import of sport-hunted elephant trophies from Zimbabwe enhances the survival of the species." J.A. 373.

Those findings remained in effect until April 4, 2014, when the Service made an interim negative enhancement finding and suspended the importation of sport-hunted elephant trophies from Zimbabwe. Memorandum, Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014, U.S. Fish and Wildlife Service (Apr. 17, 2014), *reproduced at* J.A. 496–501. The Service noted that publicly available survey information suggested that "the elephant population in Zimbabwe has declined from 84,416 elephants in 2007 to 47,366 elephants in 2012." J.A. 500. But the Service explained that "[t]he most significant aspect of [its] analysis is the lack of recent data on what is occurring in Zimbabwe." J.A. 501. The Service had not received any information in writing from the Zimbabwean Government since 2007, when it had received three undated and unsigned papers that relied on dated information. And the Service had gained little new information from the occasional meetings it had with Zimbabwean officials since 2007. Lacking current data from the Zimbabwean government regarding its conservation programs and the status of the elephant population, the Service determined that it was not possible "to

make a positive finding that sport-hunting is enhancing the survival of the species." *Id.* It therefore temporarily banned imports of sport-hunted trophies of elephants from Zimbabwe until better information could be obtained from the Zimbabwean government, and sent a letter to authorities in Zimbabwe requesting more information. J.A. 468–69.

The Service announced the negative enhancement finding in a press release on its website on April 4, 2014, but did not publish notice of the finding in the Federal Register until May 12, 2014. Interim Suspension of Imports of Elephant Trophies from Zimbabwe, 79 Fed. Reg. 26,986 (May 12, 2014). Without expressly inviting public comment, the notice stated that the Service was "actively pursuing additional information" from Zimbabwe and "other sources" to "make a final [enhancement] determination" for 2014. *Id.* at 26,987.

Over the next several months, the Service received and considered information submitted by the Zimbabwean government, safari outfitters, including Safari Club, and conservation and hunting associations. Based on the submitted information, the Service issued a final negative enhancement finding on July 17, 2014. Memorandum, Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014, U.S. Fish and Wildlife Service (July 22, 2014), *reproduced at* J.A. 520–32; *see also* Notice of Suspension of Imports of Zimbabwe Elephant Trophies Taken in 2014 on or After April 4, 2014, 79 Fed. Reg. 44,459 (July 31, 2014). The Service explained that Zimbabwe's population estimates for its elephants were "clearly based on outdated information." J.A. 525. The few recent surveys provided by Zimbabwe exhibited a number of faults that rendered them prone to double counting. *Id.* The submissions similarly lacked reliable information regarding Zimbabwe's management plans, anti-poaching efforts, and regulation of elephant hunting. *Id.* at

524–28. Unable to make a positive enhancement finding on the basis of the new information, the Service forbid the importation of elephants harvested in Zimbabwe from April 4, 2014 through the end of the year.

On March 26, 2015, the Service made yet another negative enhancement finding, banning the importation of trophies of "elephants taken in Zimbabwe during the 2015 hunting season and *future* hunting seasons." Memorandum, Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe On or After January 1, 2015, U.S. Fish and Wildlife Service (Mar. 26, 2015), *reproduced at* J.A. 588–605; *id.* at 588; *see also* Notice of Continued Suspension of Imports of Zimbabwe Elephant Trophies Taken On or After April 4, 2014, 80 Fed. Reg. 42,524 (July 17, 2015). Once again, the finding was "due to the Service being unable to make [a positive] enhancement finding even after receiving additional materials from Zimbabwe's Parks and Wildlife Management Authority and others," including Safari Club. 80 Fed. Reg. at 42,525.

## B.   Procedural Background

On April 21, 2014, Safari Club, later joined by the NRA, filed a complaint in the District Court, challenging the Service's April 4, 2014 enhancement finding pertaining to importation of African elephant trophies from both Zimbabwe and Tanzania. *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 31 (D.D.C. 2014). The District Court granted the federal defendants' motion to dismiss the Tanzanian claims on the grounds that the plaintiffs had not exhausted their administrative remedies, since no member of the Safari Club or NRA had applied for an import permit for any Tanzanian elephant. *Safari Club Int'l v. Jewell*, 76 F. Supp. 3d 198, 206–09 (D.D.C. 2014). The court also allowed the plaintiffs to

amend their complaint to add claims challenging the July 2014 enhancement finding. *Id.* at 205–06. The Court of Appeals reversed the dismissal of the Tanzanian claims, holding that Safari Club and the NRA had standing, the April and July findings were final agency actions, and Safari Club did not need to seek a permit in order to exhaust its administrative remedies. *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1285–90 (D.C. Cir. 2016).

In June 2015, Safari Club and the NRA ("Appellants") filed a separate action alleging that the Service's March 26, 2015 enhancement finding violated the ESA, 16 U.S.C. § 1531 *et seq.*, and the APA, 5 U.S.C. § 706. Complaint for Declaratory and Injunctive Relief, ¶¶ 88–125 (June 30, 2015); *see also Safari Club Int'l v. Jewell*, 213 F. Supp. 3d 48, 51 (D.D.C. 2016). Members of both organizations had harvested elephants in Zimbabwe in 2014 and 2015. However, as a result of the challenged enhancement findings, the members were barred from importing the trophies into the United States. Complaint, ¶¶ 18, 24; Appellants' Br. 57–58. The District Court consolidated the two Zimbabwe-related cases and granted leave to Friends of Animals and the Zimbabwe Conservation Task Force to intervene as defendants. That consolidated case is the subject of this appeal.

The plaintiffs made four principal ESA and APA claims before the District Court. First, they claimed that the Service's reasoning was arbitrary and capricious, in part because the findings imposed a standard greater than "enhancement." Second, they argued that by resting on the absence of evidence that sport hunting enhances the survival of the African elephant in Zimbabwe, the findings violated the presumption of legality established in section 9(c)(2) of the ESA. Third, they claimed that the removal of the enhancement-finding requirement from the Convention in 1994 required the Service to initiate rule

making with respect to the Special Rule's enhancement condition. Finally, the plaintiffs contended that the three enhancement findings were rules subject to notice-and-comment rule-making procedures under § 553 of the APA. *See Safari Club*, 213 F. Supp. 3d at 61.

Safari Club and the NRA moved for summary judgment on February 18, 2016. The Service and intervenors opposed that motion and cross-moved for summary judgment in their favor.

On September 30, 2016, the District Court entered summary judgment for the government on every claim but one, which the Service has not appealed. *Safari Club*, 213 F. Supp. 3d at 51. The court held that (1) none of the three findings were arbitrary and capricious, *id.* at 73–81; (2) it was reasonable for the Service "to interpret the Special Rule as rebutting [section 9(c)(2) of the ESA's] statutory presumption," *id.* at 66; (3) the Service was not required to initiate rule-making proceedings under the ESA when the enhancement condition was removed from CITES in 1994, *id.* at 66–67; and (4) the enhancement findings resulted from adjudications and therefore were not subject to the APA's rule-making requirements, *id.* at 62–64.

Safari Club and the NRA have now appealed the denial of their motion for summary judgment and the entry of judgment for Appellees.

## II. ANALYSIS

### A. Standard of Review

"We review an order granting summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017). "In a case like the

instant one, in which the District Court reviewed an agency action under the APA, we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n,* 309 F.3d 808, 814 (D.C. Cir. 2002).

The APA requires that we "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A disputed action also may be set aside as arbitrary and capricious if the agency has acted "without observance of procedure required by law." *Id.* § 706(2)(D); *see Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (noting that "even in cases arising under § 706(2)(D), the arbitrary-and-capricious standard frequently governs"). In applying the arbitrary and capricious standard, we consider whether the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The court may "not . . . substitute its [own] judgment for that of the agency," *id.*, and deference is especially warranted where the decision at issue "requires a high level of technical expertise," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989). Nonetheless, we must determine whether the Service "examine[d] the relevant data and articulate[d] a . . . rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

The APA also provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

In considering whether an agency's construction of its authorizing statute is permissible, we apply "the ordinary tools of statutory construction" to "determine 'whether Congress has directly spoken to the precise question at issue.'" *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If the statute is ambiguous and the agency has acted pursuant to congressionally delegated authority to make law and with the intent to act with the force of law, we will defer to the agency construction so long as it is reasonable. *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 229 (2001). "[T]he question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not." *City of Arlington*, 569 U.S. at 301.

Finally, "[w]e must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Castlewood Products, L.L.C. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004) (*quoting Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

## B. The Meaning of "Enhance" in the Service's Regulation

Appellants first argue that the disputed enhancement findings should be overturned because the Service failed to apply the correct standard in determining whether to ban

elephant imports. As noted above, the Special Rule forbids the importation of sport-hunted elephant trophies absent a "determination" by the Service "that the killing of the trophy animal will *enhance* the survival of the species." 50 C.F.R. § 17.40(e)(6)(i)(B) (emphasis added). Appellants claim that the Service banned elephant imports on the ground that there was no evidence to support findings that sport hunting would "ensure" the survival of the elephants. Appellants' Br. 32–36. Appellants thus contend that the Service erred because it applied a standard that is more stringent than the "*enhance*" standard in the Service's regulation.

Appellants appear to assume that 50 C.F.R. § 17.40(e)(6)(i)(B) requires the Service to make a positive enhancement determination if it finds *any* potential benefit to the survival of elephants from sport hunting. In Appellants' view, it does not matter whether the benefits of sport hunting are outweighed by its risks to the threatened species. Thus, according to Appellants, the Service was obliged to make a positive enhancement finding once it found that there were some benefits from hunting.

In particular, Appellants argue that it was error for the Service to consider whether the overall elephant population had declined, and to take into account non-sport-hunting related threats to the elephants, such as poaching. Appellants consider these matters irrelevant with respect to whether sport hunting will "mak[e] the situation better" for elephants than the absence of hunting. Appellants' Reply Br. 3; *see* Appellants' Br. 34. Appellants also point out that in both the July 2014 and March 2015 findings, the Service acknowledged that "scattered around Zimbabwe" are "'bright spots' of elephant conservation efforts," but concluded that "there are not enough of these 'bright spots' to overcome the problems currently facing Zimbabwe elephant populations and to support a finding that

sport hunting is enhancing the survival of the species." J.A. 532, 605. Appellants insist that requiring conservation efforts to "overcome" threats to the elephants amounts to a requirement that sport hunting guarantee, not merely "enhance," elephant survival. Appellants' position is specious.

The Service reasonably interpreted the Special Rule to require a holistic inquiry into whether hunting enhances the species' survival on net, taking into account the sustainability of the existing elephant population in light of the obvious detriments hunting poses to elephant survival. As the Service explained in its March 2015 finding, the enhancement determinations, among other things, "look[] to determine [1] if a country has sufficient numbers of elephants to support a hunting program, [2] if the country has a management plan and adequate laws and regulations to effectively implement a hunting program, and [3] if the participation of U.S. hunters in the program provides a clear benefit to the species to meet the [Special Rule's] requirements for . . . import." J.A. 589. Appellants would have the Service focus exclusively on the last consideration – the benefits of hunting – in isolation from information about the viability of the elephant population being hunted and Zimbabwe's ability to regulate the hunting program.

Nothing in the Special Rule supports Appellants' reading of "enhance." The sustainability of Zimbabwe's elephant population and the status of the government's elephant management plan bear directly on the effects of hunting on elephant survival. For example, one of the Service's concerns is that the current level of offtake from sources other than sport hunting, such as poaching, culling, or problem animal control, might be higher than appropriate to maintain a healthy population of elephants. *See, e.g.*, Memorandum, July 22, 2014 Enhancement Finding, J.A. 524; *see also* 80 Fed. Reg. at

42,526; 79 Fed. Reg. at 44,460. In these circumstances, sport hunting might on net decrease the number of elephants in the wild if the existing population is simply too sparse to support reductions by hunting.

The Service's interpretation of its regulation is entirely consistent with the definition of "enhance" and perfectly reasonable. Appellants define "enhance" as to "heighten, increase." Appellants' Br. 32 (*citing* Merriam-Webster.com, "Enhance" (Dec. 5, 2017), http://www.merriam-webster.com/ dictionary/enhance). That definition in no way forecloses the Service from requiring hunting to "increase" elephant survival on the whole, taking into account the full biological and institutional context bearing on the health of the species. The Service's interpretation of its Special Rule easily passes muster under the applicable standard of review. *See Thomas Jefferson Univ.*, 512 U.S. at 512 (holding that "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation").

### C. Appellants' Claim that the Enhancement Findings Are Foreclosed by Section 9(c)(2) of the ESA

Appellants additionally argue that the Service's negative enhancement findings are improper because they rest on the *absence* of evidence that sport hunting enhances the survival of the species, rather than on an affirmative finding that sport hunting *fails* to enhance the survival of the African elephant in Zimbabwe. Appellants assert that the Service's approach is based on an impermissible construction of the ESA because section 9(c)(2) of the act provides that "[a]ny importation into the United States" of non-endangered, Appendix II species "shall" (where certain conditions not at issue here are satisfied) "be presumed to be an importation not in violation of any provision of [the ESA] or any regulation issued pursuant to [the

ESA].” 16 U.S.C. § 1538(c)(2). Given that the Special Rule is a "regulation issued pursuant to [the ESA]," *id.*, Appellants insist that section 9(c)(2) applies to its terms. Accordingly, because the Service found the evidentiary record inadequate to make an affirmative determination as to whether sport hunting was a net positive for Zimbabwe's African elephant population, Appellants contend that the statutory presumption required the Service to authorize importation. We find no merit in this claim. We also find that the Service's interpretation of the ESA is reasonable and entitled to deference. *See City of Arlington*, 569 U.S. at 296.

"To establish a 'presumption' is to say that a finding of the predicate fact . . . produces a required conclusion *in the absence of explanation*." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (internal quotation marks omitted) (emphasis added). Thus, a presumption is generally rebuttable by the presentation of contrary evidence. *See* FED. R. EVID. 301; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Indeed, Appellants acknowledge that the presumption is not conclusive. *See* Oral Arg. Recording 1:52–2:09 ("We[, the Appellants,] are not arguing . . . that section 9(c)(2) . . . creates a conclusive presumption of importability.").

In this case, there is no serious dispute over the fact that the regulatory criteria for import were not satisfied. Therefore, the section 9(c)(2) presumption was overcome by the combination of the Special Rule, the administrative record underlying the Special Rule, and the fact-finding in this case with respect to the current status of Zimbabwe's elephant population and management program. The Special Rule says that "sport-hunted trophies may be imported into the United States provided . . . [a] determination is made that the killing of the trophy animal will enhance the survival of the species." 50 C.F.R. § 17.40(e)(6)(i). No such determination was made here.

Any "presumption" that this precondition was satisfied is easily rebutted by the self-evident fact that it was not.

The principal problem with Appellants' argument is that it mischaracterizes the Special Rule and the Service's application of the rule. The Special Rule does not require the Service to affirmatively find that killing the species does *not* enhance species survival in order to ban importation of sport-hunted elephant trophies. The Special Rule allows such imports only if, among other things, the Service can find that hunting enhances survival. Given that an affirmative enhancement finding is a regulatory precondition to the lawful importation of Zimbabwean elephants, so too, by necessary extension, is an adequate evidentiary basis for making such a finding. Therefore, the Service's conclusion that it lacked evidence to make a positive enhancement finding, together with the Special Rule's affirmative enhancement condition and the underlying administrative record that led to the rule's adoption, rebuts any presumption that the importation of African elephants complies with the Special Rule.

Section 9(c)(2) in no way constrains the Service's section 4(d) authority to condition the importation of threatened Appendix II species on an affirmative enhancement finding. Under section 4(d) of the ESA, the Service "shall issue such regulations as [it] deems necessary and advisable to provide for the conservation of [threatened] species" and may "prohibit with respect to any threatened species any act prohibited . . . with respect to endangered species." 16 U.S.C. § 1533(d). Because the Service may generally bar imports of endangered species, *see id.* § 1538(a)(1)(A), it may do the same with respect to threatened species under section 4(d), *see id.* § 1533(d). Appellants do not dispute that the promulgation of a blanket ban would be permissible and rebut the presumptive legality of Zimbabwean elephant imports. If the Service has the

authority to completely ban imports of African elephants by regulation under section 4(d), it logically follows that it has authority to allow imports subject to reasonable conditions, as provided in the Special Rule. Therefore, even assuming that section 9(c)(2) applies to the Special Rule, it merely establishes a presumption that the regulation's conditions have been met, absent a finding to the contrary. It does not dictate the content of the conditions.

In fact, Appellants have conceded that the Special Rule's enhancement condition is consistent with section 9(c)(2). At oral argument, counsel for Appellants repeatedly disavowed any argument that the Service lacked the authority to require a positive enhancement finding as a condition of importation of African elephant trophies. *See* Oral Arg. Recording 1:30–2:16 ("We are not arguing that section 9(c)(2) prevents the Service from enacting a special rule under Section 4(d). We are not arguing that [section] 9(c)(2) overrides any such special rule. We are not arguing that section 9(c)(2) conflicts with section 4(d) of the ESA. And we are not arguing . . . that section 9(c)(2) . . . preempts section 4 or creates a conclusive presumption of importability."); *see also id.* at 12:25–16:06 ([Question:] "Are you saying that the regulation with the elephant rule is unlawful under the statute?" [Answer:] "No.").

In sum, Appellants do not dispute that the Service has authority under the ESA to promulgate regulations that restrict the importation of African elephant trophies. The Service has chosen to exercise this authority by requiring an affirmative demonstration that sport hunting enhances the survival of the African elephant as a precondition to import. Even if Appellants are correct that the statutory presumption applies to this precondition, the presumption has been rebutted by an affirmative finding of a lack of evidence of enhancement.

### D. The Removal of the Enhancement Requirement from the Convention

Appellants additionally contend that the 2014 and 2015 enhancement findings should be overturned on the ground that they cannot be squared with the 1994 amendment to the Convention. We find no merit in Appellants' arguments resting on this claim.

As noted above, before 1994, both the Convention and the Special Rule required the Service to make an enhancement determination before issuing a permit to import the trophy of an Appendix I species. *See* 57 Fed. Reg. at 35,485 (adding the enhancement requirement to the Special Rule in 1992). The Convention was amended to remove this requirement in 1994. However, the United States retained the requirement in its African elephant Special Rule issued under the ESA. *See* 50 C.F.R. § 17.40(e)(6)(i)(B); 62 Fed. Reg. at 44,633 (explaining that the enhancement condition "continue[d] to apply" after African elephants were transferred to Appendix II of the Convention). Appellants argue that the Special Rule cannot stand now that the enhancement requirement has been eliminated from the Convention. This claim is meritless.

First, Appellants allege that the Service "violated [§ 553 of] the APA by changing a regulation—retaining an enhancement finding requirement although the reason for it disappeared—without going through a proper rulemaking process." Appellants' Br. 52. Appellants are mistaken. The fact that the Service continued to apply the enhancement condition *after* the 1994 amendment of the Convention did not in any way alter the Special Rule.

Second, Appellants argue that the sole reason the Service added the enhancement condition to the Special Rule was to

comply with the Convention. Appellants' Br. 54. Thus, according to Appellants, once the provision was removed from the Convention, the only justification for the Special Rule's enhancement condition disappeared and the agency was obligated to explain its continued reliance on the provision. Appellants' view of the Special Rule and its purposes is off base.

One purpose of the enhancement condition was to implement the Convention. However, another purpose was to promote the conservation of African elephants by authorizing only those imports of sport-hunted trophies that enhance elephants' survival. In the preamble to the Special Rule, the Service stated that sport hunting "provide[s] financial support programs for elephant conservation." 57 Fed. Reg. at 35,485. In response to a comment, the Service explained that the Special Rule "supports . . . carefully regulated consumptive uses of African elephants" like sport hunting "as mechanisms for attaining revenues to enhance elephant and wildlife management throughout the African continent." *Id.* at 35,476. And in 1997, the Service reiterated that the enhancement condition "ensure[s]" that each country's management program "is promoting the conservation of the species." 62 Fed. Reg. at 44,633. The 1994 amendment of the Convention did not change the pro-conservation purpose of the Special Rule's enhancement condition. Therefore, the Service had no obligation to reconsider the Special Rule or explain its failure to do so.

Third, "if a significant factual predicate of a prior decision . . . has been removed," an agency may be petitioned to pursue rule making to "reconsider" its approach. *WWHT, Inc. v. FCC,* 656 F.2d 807, 819 (D.C. Cir. 1981). However, judicial review of an agency's denial of a petition to initiate rule making "is extremely limited and highly deferential." *Massachusetts v.*

*EPA*, 549 U.S. 497, 527–28 (2007); *see also WildEarth Guardians v. EPA*, 751 F.3d 649, 653 (D.C. Cir. 2014); *New York v. U.S. Nuclear Regulatory Comm'n*, 589 F.3d 551, 554 (2d Cir. 2009) (citing *Massachusetts v. EPA* and noting that review of a denial of rule making has been said to be "akin to non-reviewability" and falls "at the high end of the range of deference and an agency refusal is overturned only in the rarest and most compelling of circumstances," "typically involv[ing] plain errors of law").

In this case, Appellants did not petition the Service to pursue rule making, so there is no denial of any such petition for the court to review. Furthermore, it is clear that, because some of the principal justifications for the Special Rule have not changed, the Service had no obligation to act *sua sponte* to revisit the conditions contained in the rule. Indeed, the Special Rule is perfectly consistent with section 4(d) of the ESA, which authorizes the Service to promulgate rules that are "necessary and advisable to provide for the conservation of [threatened] species." 16 U.S.C. § 1533(d).

Fourth, Appellants' reliance on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), is misplaced. It is true that when an agency changes its position regarding a regulatory matter, it must "provide reasoned explanation for its action." *Id.* at 515. As noted above, however, the Service did not change course when it retained the Special Rule after the Convention was amended. The Service was fully within its rights to retain its regulatory approach because the Convention expressly allows signatories to enforce stricter regulations than provided in the treaty. *See* CITES art. XIV(1)(a), 27 U.S.T. at 1108.

Finally, if Appellants' complaint in this case was meant to raise a facial challenge to the Special Rule, the challenge comes too late. The window to challenge the validity of the regulation

has long passed. *See* 28 U.S.C. § 2401(a) (barring civil claims against the United States "unless the complaint is filed within six years after the right of action first accrues"); *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014); *see also Sierra Club de Puerto Rico v. EPA*, 815 F.3d 22, 26–28 (D.C. Cir. 2016) (holding that petitioners' challenge to the application of an old regulation to a new situation was untimely under the Clean Air Act, 42 U.S.C. § 7607(b)(1)).

**E. The Service's Failure to Engage in Notice-and-Comment Rule Making Before Adopting the Enhancement Findings**

The APA provides that when an agency proposes to promulgate a rule, it must follow the procedures set out in 5 U.S.C. § 553. Among other things, the agency must publish a notice "of proposed rule making" in the Federal Register. 5 U.S.C. § 553(b). It must then "give interested persons an opportunity to participate in the rule making through submission" of comments, which the agency must consider. *Id.* § 553(c). A final rule must contain a statement of its basis and purposes, *id.*, and be published in the Federal Register "not less than 30 days before its effective date," *id.* § 553(d).

At oral argument before this court, the Service conceded that it did not comply with the requirements of § 553 of the APA in issuing its enhancement findings. The Service maintained that it was under no obligation to do so, because, as the District Court found, the findings were the product of informal adjudications and, therefore, not subject to notice-and-comment requirements. We disagree. The enhancement findings reflect a final rule and, therefore, the Service was required to adhere to the notice-and-comment procedures under 5 U.S.C. § 553.

*1. "Rule Making" Versus "Adjudication" Under the APA*

When agencies have the statutory authority to engage in rule making and adjudication, they have broad discretion to choose which route to pursue. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 291–94 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). But when an agency chooses to issue a rule, and "formal" procedures are not required, it must follow the procedures indicated in § 553. *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 763–66 (1969) (plurality opinion). An agency may not escape the requirements of § 553 by labeling its rule an "adjudication." *See, e.g.*, *id.*; *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1284–85 (D.C. Cir. 2005) (finding that the Corps' issuance of nationwide dredge-and-fill permits was rule making and not adjudication, and stating that "'rules is rules,' no matter their gloss"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation."); *Thomas v. New York*, 802 F.2d 1443, 1447 (D.C. Cir. 1986) (explaining that if EPA's endangerment finding was binding, then it was a "rule" that "could not be promulgated without notice-and-comment procedures"); *Batterton v. Marshall*, 648 F.2d 694, 710 (D.C. Cir. 1980) ("[W]here, as here, the agency action satisfies the APA's definition of a rule and eludes exemptions to § 553, it is procedurally defective unless promulgated with the procedures required by law.").

The APA defines "rule making" as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). A "rule" is defined "very broadly," *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002), to mean

"the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). On the other hand, an "adjudication" is the "agency process for the formulation of an order," *id.* § 551(7), and an "order" is "the whole or a part of a final disposition . . . of an agency in a matter other than rulemaking but including licensing," *id.* § 551(6).

The Supreme Court has explained that "[t]he basic distinction between rulemaking and adjudication is illustrated by [the] Court's treatment of two related cases under the Due Process Clause of the Fourteenth Amendment." *Fl. E. Coast*, 410 U.S. at 244. In *Londoner v. City and County of Denver,* 210 U.S. 373 (1908), the Court held that it violated the Due Process Clause for an agency to tax property that fronted particular streets without providing a hearing for the property owners. But in *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441 (1915), the Court upheld a state agency's decision to increase the valuation of all taxable property in Denver without providing any type of hearing for those affected. Central to the distinction was that the agency's action in *Bi-Metallic* was generally applicable to an open class of all Denver property owners while *Londoner* involved a particularized order affecting particular owners "in each case upon individual grounds." *Bi-Metallic*, 239 U.S. at 446; *see also Fl. E. Coast*, 410 U.S. at 245.

Judicial constructions of a "rule" under the APA follow these precepts. Two principles stand out. First, most legislative rules are generally applicable. *E.g.*, *Bell Aerospace*, 416 U.S. at 293–94 (characterizing rules as framing "generalized standard[s]" and orders as "individual" and "case-by-case"); *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017) ("Rulemaking scenarios generally involve broad applications

of more general principles rather than case-specific individual determinations.").

Second, rules generally have only "future effect" while adjudications immediately bind parties by retroactively applying law to their past actions. *E.g.*, *Wyman-Gordon Co.*, 394 U.S. at 763–66 (plurality opinion); *see also id.* at 775–81 (Harlan, J. and Douglas, J., agreeing with the plurality on this point); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216–17 (1988) (Scalia, J., concurring) (stating that the "central distinction between rulemaking and adjudication" is that "rules have legal consequences only for the future"); *Neustar*, 857 F.3d at 895 (stating that while "it may be proper to enter an adjudicatory order without retroactive effect," "adjudication is by its nature retroactive"); *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) (stating that "an adjudication *must* have retroactive effect, or else it would be considered a rulemaking").

Thus, in *United States v. Florida East Coast Railway Co.*, 410 U.S. 224 (1973), the Supreme Court explained that the agency's action resulted in a rule, not an order, because it was "generalized [in] nature" in that it "[was] applicable across the board to all of [a class of] common carriers," and it was intended "for prospective application only, rather than [used to] adjudicate[e] a particular set of disputed facts." *Id.* at 246. In this case, the 2014 and 2015 enhancement findings had all of the qualities of a legislative rule, so the Service was obligated to follow the APA's notice-and-comment procedures before promulgating the findings.

2. *The 2014 and 2015 Enhancement Findings Reflect a Final Rule*

The disputed enhancement findings in this case applied to all potential imports of sport-hunted elephant trophies from Zimbabwe, not to any individual parties. *See, e.g.*, April 2014 Finding, J.A. 501 ("[T]he Service . . . will not allow the import of sport-hunted elephant trophies taken in Zimbabwe after April 4, 2014."); July 2014 Finding, J.A. 532 ("[N]o elephants harvested during 2014," except for those harvested before the announcement of the temporary suspension on April 4, 2014, "may be imported into the United States."); March 2015 Finding, J.A. 605 ("[N]o elephants harvested in Zimbabwe on or after January 1, 2015 may be imported into the United States."). The findings did not adjudicate any dispute between specific parties.

Furthermore, the Service's ban on imports was only meant to bind hunters in future permitting adjudications and enforcement actions, regardless of when they actually harvested their elephant trophy. The April 4, 2014 interim finding, as revised on April 17, 2014, banned importation of sport-hunted elephants from Zimbabwe after the date of the finding, April 4, 2014. J.A. 501. The District Court revised the effective date of that finding to May 12, 2014, the date notice was published in the Federal Register, *Safari Club*, 213 F. Supp. 3d at 73, and the Service has not appealed that decision. The July finding, which superseded the April finding, likewise applied only to future imports of elephants hunted after April 4, 2014. J.A. 532. And the March 2015 finding applied to "elephants harvested in Zimbabwe on or after January 1, 2015." J.A. 605. The latter two findings covered harvests that took place several months before the date of the findings, but they only banned the importation of sport-hunted elephants from Zimbabwe going forward, throughout the rest of the

relevant year. Those findings were not retroactive because their issuance resulted in no immediate legal consequences for any specific parties.

This is not a case in which the agency made its findings in the course of denying an application for an import permit, as was true in *Franks v. Salazar*, 816 F. Supp. 2d 49, 54 (D.D.C. 2011) and *Marcum v. Salazar*, 810 F. Supp. 2d 56, 64 (D.D.C. 2011), *vacated and remanded on other grounds by* 694 F.3d 123 (D.C. Cir. 2012). And the Service has not argued that the enhancement findings were "licensing" actions. Rather, the 2014 and 2015 enhancement findings simply established a standard binding on the agency – a negative enhancement finding and ban on imports – to be applied to future requests to import certain sport-hunted elephants, until such time as the Service decides to issue a new rule based on different information.

*National Biodiesel Board v. EPA*, relied on by the Service, actually illustrates this point. 843 F.3d 1010, 1018 (D.C. Cir. 2016). In that case, the EPA certified that the compliance plan of a single entity, an Argentinian association of biofuel producers ("CARBIO"), satisfied the EPA's regulations. *See id.* at 1013–15. Domestic biofuel producers alleged the EPA's approval of CARBIO's application was a rule making. We held that "EPA's approval of the . . . plan was a straightforward instance of adjudication." *Id.* at 1017–18. Unlike the findings in this case, the application's approval was highly particularized, binding one entity. We emphasized that "[t]he approval, by its own terms, applies only to the CARBIO program; indeed, [the petitioner] never even suggests that an entity other than CARBIO or its producer-members could avail itself of the program without making a separate application to EPA." *Id.* at 1018. It would have been a different situation entirely had the EPA suddenly issued a press release, without

any application before it, that bound the agency to approving all future certification applications submitted from Argentinian biofuel producers.

Furthermore, the fact that the negative enhancement findings applied, and did not change, the enhancement standard established in the Special Rule did not make them adjudications. The APA's definition of "rule" includes certain statements that "implement" and "interpret" law. 5 U.S.C. § 551(4). Here, the three findings on review "implement[ed]" and "interpret[ed]" the Special Rule's enhancement requirement by issuing negative enhancement determinations for African elephants. *Id.* And, of course, they also "prescribe[d]" law in the form of enacting new, binding import bans. *Id.*

The District Court read *Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007) as holding that an agency action could be an adjudication in the absence of "a pending matter before the agency." *Safari Club*, 213 F. Supp. 3d at 63. That case involved an arbitrary and capricious challenge to the FAA's imposition of testing requirements on certain companies but not others, through the publication of "advisory circulars." *Safe Extensions*, 509 F.3d at 595. However, *Safe Extensions* did not consider whether the circulars were rules, and if so, whether they were subject to notice and comment. The decision is therefore inapposite.

Finally, the Service claims that any challenges to the April finding are moot because the July finding superseded it. However, the Service admits it did not engage in notice-and-comment rule making for any of the disputed enhancement findings, including the July finding. Therefore, the dispute over the April finding is not moot.

### 3. *Harmless Error*

Finally, the Service argues that any error resulting from its failure to use notice-and-comment rule making was not prejudicial to Appellants. We reject this claim.

The court's decision in *Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002), is controlling. That case involved a similar failure to follow notice-and-comment procedures. The Department of Agriculture ("USDA") implemented a "payment-in-kind program" for sugar in 2001 without proceeding by notice and comment. *Id.* at 91–92. In January 2001, before implementing the program, the government met with interested persons to hear their concerns about the program. *Id.* at 92. Before announcing the program, "Department employees had approximately a dozen contacts with sugar industry representatives regarding the possibility of a 2001 program." *Id.* The USDA announced the program by press release and subsequently published notice in the Federal Register in September of 2001. *Id.* Despite these attempts to provide public notice in the Federal Register and solicit comments from interested persons, the court held that the failure to conduct notice-and-comment rule making was not harmless. *Id.* at 96.

The court explained that "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Id.* The court went on to reject the notion that complainants must indicate "additional considerations they would have raised in a comment procedure," had they been given the opportunity. *Id.* at 97. The court explained:

> Here the government would have us virtually repeal section 553's requirements: if the government could

> skip those procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated. The government could avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.

*Id.* at 96–97.

So, too, in this case. The Service insists that it effectively complied with § 553 because in May 2014 it published notice of its interim finding in the Federal Register. However, that notice never invited comment from the public. It merely stated that the agency was "actively pursuing additional information" from Zimbabwe and "other sources" to "make a final determination" for 2014. 79 Fed. Reg. at 26,987. This phrasing makes it far from clear that the May notice was soliciting comments from all interested parties. Indeed, while Safari Club submitted comments, the NRA did not. Nor did the July 2014 or March 2015 findings invite public comment. Quite to the contrary, they presented their negative enhancement findings as conclusions at which the Service had already arrived—as the culmination, in other words, rather than the initiation, of the decisionmaking process. *See* 79 Fed. Reg. at 44,461 ("[T]he Service is unable to make a finding that sport hunting in Zimbabwe is enhancing the survival of the species."); 80 Fed. Reg. at 42,524 ("[T]he suspension on the import of sport-hunted African elephant trophies taken in Zimbabwe on or after April 4, 2014, [will] be continued until further notice."). On the record before us, we hold that *Sugar Cane Growers* controls.

Accordingly, we reject the Service's contention that any error was harmless.

### III. CONCLUSION

For the reasons set forth above, we affirm in part and reverse in part. The case will be remanded to the District Court with instructions to remand the case to the Service so that it may initiate rule making to address enhancement findings for the time periods at issue in this case.

*So ordered.*