# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 11, 2021          Decided June 29, 2021

No. 20-1242

NEW YORK STOCK EXCHANGE LLC, ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

Consolidated with 20-1243, 20-1244

———

On Petitions for Review of Orders
of the Securities and Exchange Commission

———

*Paul S. Mishkin* argued the cause for petitioners. With him on the briefs were *Amir C. Tayrani, Joshua M. Wesneski, Matthew A. Kelly, Paul E. Greenwalt III,* and *Michael K. Molzberger.*

*Martin Totaro*, Senior Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Michael A. Conley*, Acting General Counsel, and *Tracey A. Hardin*, Assistant General Counsel.

Before: HENDERSON and ROGERS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Thirteen nationally registered stock exchanges ("Petitioners") seek review of four orders issued by the Securities and Exchange Commission ("Commission"). Under the Securities Exchange Act ("Act"), a final order of the Commission must be challenged "within sixty days after the entry of the order." 15 U.S.C. § 78y(a)(1). The Petitioners filed their challenges 65 days after the orders were entered. Attempting to evade the obvious, they argue that the challenged orders are not in fact orders but rather rules, which are subject to a different filing deadline. *See id.* § 78y(b)(1). We disagree. Under the Act, a petition challenging an order designated as such is subject to the deadline imposed by § 78y(a)(1). Accordingly, we dismiss the petitions as untimely.

**I.**

The Securities Act Amendments of 1975 give the Commission the authority "to facilitate the establishment of a national market system for securities." 15 U.S.C. § 78k-1(a)(2). The National Market System (NMS) is effectively the communication and data processing infrastructure of the stock market. Its purpose is to "foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors, facilitate the offsetting of investors' orders, and contribute to best execution" of orders for qualified securities. *Id.* § 78k-1(a)(1)(D).

National stock exchanges, like the Petitioners, work with the Commission to administer the NMS. The Petitioners are referred to as "self-regulatory organizations" (SROs). *See id.*

§ 78c(a)(26). Together with the Commission, SROs are responsible for planning, operating and regulating the NMS. *See id.* § 78k-1(a)(3)(B); *see also* 17 C.F.R. § 242.603(b). The NMS is comprised of numerous NMS Plans covering a variety of topics. Any two or more SROs can develop a Plan, subject to the approval of the Commission. 17 C.F.R. §§ 242.608(a)(1), (b)(2).

This case involves three Plans, called Equity Data Plans, that govern the collection, processing and distribution of stock quotation and transaction information. In 2019, the Petitioners proposed to amend the Plans by creating new confidentiality and conflict-of-interest disclosure requirements for the SROs. On January 14, 2020, the Commission published notice of the proposed amendments and solicited public comment. It also invited comment on several dozen questions it posed regarding the scope and efficacy of the proposed amendments.

Commission Rule 608 governs the initiation and modification of NMS Plans. It provides:

> The Commission shall approve a national market system plan or proposed amendment to an effective national market system plan, with such changes or subject to such conditions as the Commission may deem necessary or appropriate, if it finds that such plan or amendment is necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system, or otherwise in furtherance of the purposes of the Act. . . . Approval or disapproval of a national market system plan, or an amendment to an effective national market system plan *(other than an amendment initiated by the Commission)*, shall be

by order. Promulgation of an amendment to an effective national market system plan *initiated by the Commission* shall be by rule.

*Id.* § 242.608(b)(2) (emphases added). Exercising this authority, the Commission made several changes to the SRO-proposed amendments and, on May 6, 2020, entered them in four documents labeled "Order" (collectively, "Amendments"). The Amendments were published in the Federal Register on May 12, 2020.

The Commission-approved Amendments differ from those proposed by the SROs. For example, the Amendments impose certain disclosure obligations on third parties that interact with an SRO. They also require certain SRO employees to recuse themselves from certain Plan management duties if their compensation is tied to a proprietary data product offered by the SRO. According to the SROs, the Commission-approved Amendments go "well beyond" their proposals.

The Petitioners sought review in this Court on July 10, 2020—that is, 65 days after the Commission entered the four May 6 Amendments. The petitions asked the Court "to hold the Amendments unlawful under the Exchange Act and Administrative Procedure Act, to vacate the Amendments, [and] to issue a permanent injunction prohibiting the Commission from implementing and enforcing the requirements of the Amendments."

The Commission moved to dismiss the petitions as untimely under § 78y(a)(1). The Petitioners maintained that the relevant deadline is not provided by § 78y(a)(1), which pertains to orders, but rather § 78y(b)(1), which pertains to rules. Under the latter subsection, a petition for review must be filed "within sixty days *after the promulgation of the rule*." 15 U.S.C. § 78y(b)(1) (emphasis added). Under the

Petitioners' interpretation, their deadline was Monday, July 13, 2020.[1]    A motions panel of this court referred the Commission's motion to dismiss to the merits panel.

## II.

This case presents a straightforward question of statutory interpretation: whether the Amendments are "final order[s] of the Commission" within the meaning of § 78y(a)(1).    A statutory deadline should be clear and predictable and, accordingly, we answer the question by drawing a bright line, holding that the Commission's designation conclusively determines which filing deadline applies. *Cf. United States v. Boyle*, 469 U.S. 241, 248 (1985) ("The time has come for a rule with as 'bright' a line as can be drawn consistent with the statute.").

The Petitioners ask us to look at the substance of the Amendments rather than the label the Commission gives them. They note that the Amendments "do not involve case-specific individual determinations" and are intended to "have only future effect." These features, they say, make the Amendments more consistent with rules than orders.

The Act does not define "order" or "rule" so we look to the definitions in the Administrative Procedure Act (APA). *See Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007).  Under the APA, an order is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making."  5

---

[1]  An agency rule is considered promulgated on the date it is published in the Federal Register.  *See Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090, 1093 (D.C. Cir. 1997).  As noted *supra*, the Amendments were published in the Federal Register on May 12, 2020.

U.S.C. § 551(6).  A rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).  In other words, an order is virtually any authoritative agency action other than a rule.

As a leading treatise recognizes, the APA's definitions of order and rule "overlap significantly." 1 Richard J. Pierce, Jr., *Administrative Law Treatise* 701 (5th ed. 2010).  The overlap is understandable—perhaps unavoidable—because orders, like rules, "may affect agency policy and have general prospective application." *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 966 (D.C. Cir. 2013) (quoting *N.Y. State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 815 (D.C. Cir. 1984)).  We have recognized that "[m]ost norms that emerge from a rulemaking are equally capable of emerging (legitimately) from an adjudication," *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007); it may not be possible, then, to say whether the Amendments comprise orders or rules merely by examining their substance.  This makes the substance of an SRO-initiated Plan amendment a particularly poor basis for determining the applicable filing deadline.

Neither does the procedure the Commission used to approve the Amendments resolve the question of which filing deadline applies.  Sections 78y(a)(1) and 78y(b)(1) provide for judicial review of orders and rules, respectively, allowing any defects, whether procedural or substantive, to be remedied.  For instance, a petition challenging a putative Commission rule would be subject to § 78y(b)(1)'s filing deadline even if the Commission had failed to comply with the notice-and-comment procedures in § 553 of the APA; we would not conclude that the challenged rule was defective and thus not an authentic rule within the meaning of § 78y(b)(1). *See M.M.V. v. Garland*, No. 20-5106, 2021 WL 2483861, at *3 (D.C. Cir.

June 18, 2021) (A federal statute's "bar on judicial review of certain 'policies adopted' would be ineffective if 'adopted' were construed to mean 'lawfully adopted' as determined by a reviewing court."). Likewise, even if we agreed that the Amendments should have been promulgated as rules, this argument would challenge the Amendments *qua* orders—and thus be subject to the § 78y(a)(1) deadline.

Instead of focusing on an amendment's substance or the procedure used to effectuate it, we think it better to give conclusive weight to the Commission's designation. Construing § 78y(a)(1)'s use of "order" to mean "order identified as such" avoids the pitfalls of the other two approaches and—critically—promotes predictability and clarity. Regulated parties should be able to answer a simple procedural question ("What is my filing deadline?") without having to answer a complex merits question ("Did the agency properly proceed through adjudication?"). As the United States Supreme Court has explained, certainty and predictability are central to well-functioning statutory limitations. *See*, *e.g.*, *United States v. Briggs*, 141 S. Ct. 467, 471 (2020) ("clarity" is "one principal benefit" of limitations provisions); *Young v. United States*, 535 U.S. 43, 47 (2002) ("certainty" is one of the "basic policies furthered by all limitation provisions" (alteration accepted) (internal quotations omitted)); *Owens v. Okure*, 488 U.S. 235, 240 (1989) ("[p]redictability" is "a primary goal of statutes of limitations").

This is not to say that an appeal to these goals can or should overcome plain statutory language. "[W]ith respect to filing deadlines[,] a literal reading of Congress' words is generally the only proper reading of those words." *United States v. Locke*, 471 U.S. 84, 93 (1985). But if the meaning of a statutory deadline is contested, there is precedent for

interpreting the deadline using an easily ascertained bright line. In *Irwin v. Department of Veterans Affairs*, for instance, the Supreme Court determined whether the 30-day window for filing a Title VII lawsuit against the government began when the plaintiff's attorney's *office* received a certain notice or when the attorney *himself* received the notice. *See* 498 U.S. 89, 91–92 (1990). Choosing the former, the Supreme Court noted that "[t]he practical effect of a contrary rule would be to encourage factual disputes about when actual notice was received, and thereby create uncertainty in an area of the law where certainty is much to be desired." *Id.* at 93.

In *Newell v. SEC*, the Ninth Circuit considered when an order is "entered" pursuant to § 78y(a)(1)'s filing deadline. *See* 812 F.2d 1259, 1260 (9th Cir. 1987). It concluded that the date of an order's entry is its caption date and noted the "need for temporal certainty with respect to the commencement of appeal periods." *Id.* at 1261. "[C]ertainty cannot be served," it reasoned, "by an 'entry' date interpreted other than as the caption date." *Id.* Likewise, in a case interpreting an ambiguous filing deadline in a different federal statute, we chose the interpretation that resulted in "certainty of rights and deadlines." *Env't Def. Fund, Inc. v. Costle*, 631 F.2d 922, 938 (D.C. Cir. 1980). *See also Patton v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 763 F.2d 553, 560 n.14 (3d Cir. 1985) ("clarity and predictability" are "vital to litigants when filing deadlines are involved").

Granted, there are instances in which we have looked beyond an agency's label to the substance of its action. *See*, *e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332–33 (D.C. Cir. 2017); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1284 (D.C. Cir. 2005); *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95–96 (D.C. Cir. 2002); *Philadelphia Co. v. SEC*, 164 F.2d 889, 899–900

(D.C. Cir. 1947). But the Petitioners draw the wrong lesson from these cases, which stand for the proposition that an agency label does not determine the *substantive* legal standard under which we evaluate agency action. In *Safari Club*, the agency claimed that its ban on the importation of sport-hunted elephant trophies was "the product of informal adjudications" and therefore not subject to APA notice-and-comment. 878 F.3d at 320, 331. We disagreed. Because the decision constituted a "final rule," the agency had to give notice and comment. *Id.* at 331–32. *Sugar Cane Growers* was similar. There, the agency defended its payment-in-kind program for sugar beets, which it implemented via press release rather than rulemaking. 289 F.3d at 91–92. We held that the program constituted a rule, not an "isolated agency act." *Id.* at 95 (internal quotations omitted). *Home Builders* and *Philadelphia Co.* involved whether an agency label could prevent *any* judicial review. *See Home Builders*, 417 F.3d at 1284 (agency rule subject to review under Regulatory Flexibility Act); *Philadelphia Co.*, 164 F.2d at 900 (D.C. Cir. 1947) (agency order subject to review under Public Utility Holding Company Act).

Here, by contrast, the dispute involves *when* judicial review is appropriate. Had the Petitioners met the filing deadline, they would have been free to challenge the Commission's approval of the Amendments by way of order rather than rule. Deferring to the Commission's designation affects only the deadline by which the Amendments can be challenged, not the Amendments' judicial reviewability or the substantive legal standard applicable to their merits.

"Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced."

*Locke*, 471 U.S. at 101. For the reasons we have discussed, the Petitioners find themselves on the wrong side of § 78y(a)(1)'s filing deadline, thereby depriving us of subject matter jurisdiction. *See Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 245 (D.C. Cir. 2003). Accordingly, the petitions for review are dismissed.

*So ordered.*